ACCEPTED
03-14-00709-CV
4148278
THIRD COURT OF APPEALS
AUSTIN, TEXAS
2/13/2015 2:42:36 PM
JEFFREY D. KYLE
CLERK

## No. 03-14-00709-CV

_____

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
2/13/2015 2:42:36 PM
JEFFREY D. KYLE
Clerk

*In the Court of Appeals*
*Third District of Texas at Austin*

_____

ENTERGY TEXAS, INC.,
Appellant,

v.

PUBLIC UTILITY COMMISSION OF TEXAS,
Appellee.

_____

## BRIEF OF APPELLEE
## PUBLIC UTILITY COMMISSION OF TEXAS

_____

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for
Civil Litigation

JON NIERMANN
Chief, Environmental Protection
Division

ELIZABETH R. B. STERLING
Assistant Attorney General
State Bar No. 19171100
elizabeth.sterling@texasattorneygeneral.
gov

MEGAN NEAL
Assistant Attorney General
State Bar No. 24043797
megan.neal@texasattorneygeneral.gov

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
512.463.2012
512.457.4610 (fax)

ATTORNEYS FOR APPELLEE, PUBLIC UTILITY COMMISSION OF TEXAS

February 13, 2015          **ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

INDEX OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  v

GLOSSARY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ix

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  xiii

ISSUES PRESENTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  xiv

Issue 1.  Does the term "costs" as used in Texas Utilities Code § 39.452(b)
include Entergy's "lost revenues"?. . . . . . . . . . . . . . . . . . . . . . .  xiv

Issue 2.  Does the plain language of Texas Utilities Code § 39.452(b) require
Entergy to recover implementation costs before it has implemented
the competitive generation program?. . . . . . . . . . . . . . . . . . . . .  xiv

Issue 3.  Does the plain language of Texas Utilities Code § 39.452(b) require
Entergy to receive interest on the costs of implementing the
competitive generation program? . . . . . . . . . . . . . . . . . . . . . . . .  xiv

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

A. Entergy's proposed Competitive Program . . . . . . . . . . . . . . . . . . . . . . .  4

B. The Administrative Law Judge rejected Entergy's initial Competitive
Program. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

C. The Commission rejected Entergy's statutory interpretation. . . . . . . .  8

D. Stipulations and settlements in Docket No. 38951 created a very different Competitive Program than the program rejected by the ALJ – one that resulted in no unrecovered costs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    1. Participants in the Competitive Program. . . . . . . . . . . . . . . . . . . . 11

    2. Costs recovered from the Competitive Customers. . . . . . . . . . . . . 11

E. The Commission adopted the revised Competitive Tariff but not the Rejected Rider relating to embedded generation costs. . . . . . . . . . . . 13

F. Entergy's implementation costs do not accrue until the statute is implemented, and interest is not allowed. . . . . . . . . . . . . . . . . . . . . . . . 14

SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    A. Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    B. Issue 1: The Commission reasonably refused to include Entergy's lost revenues in the Competitive Tariff. . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        1. The plain language of the statute refers to costs, not lost revenues. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

            a. The *CenterPoint 2011* case holds that lost revenues are not costs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

            b. What Entergy seeks are lost revenues, not costs . . . . . . . . . . . 21

        2. Entergy's issue must be denied because it failed to show harm. . . 22

    a. Entergy has not shown that it will not recover all its costs under the Competitive Tariff. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    b. The structure of the revised Competitive Tariff and the facts ensure that Entergy will have no unrecovered costs. . . . . . . . . 26

3. The Commission's interpretation of the statute is reasonable, and Entergy's interpretation is *unreasonable* . . . . . . . . . . . . . . . . . . . . . . 32

    a. The Commission's interpretation follows the statute's plain language that limits recovery to costs . . . . . . . . . . . . . . . . . . . . . 32

    b. The Commission's interpretation of the statute is reasonable. 33

    c. Entergy's interpretation of the statute is *un*reasonable . . . . . . 34

4. Entergy cannot use traditional rate-making concepts to avoid the Legislature's mandate to transition to competition . . . . . . . . . . . . 36

C. Issue 2: Entergy should recover only implementation costs under the Competitive Rider, and they do not occur until the Competitive Program is implemented. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

1. There are no implementation costs for Entergy to recover until the Competitive Program is implemented . . . . . . . . . . . . . . . . . . . . . . . 44

2. Entergy already recovered the costs to develop the Competitive Program as operating expenses in a previous rate case. . . . . . . . . 46

a. In Docket 39896 Entergy recovered costs to develop the Competitive Program as operating expenses . . . . . . . . . . . . . . . 46

b.  It would violate the prohibition on retroactive rate-making to permit Entergy to offset the costs it has already collected from the Cost Rider . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

D. Issue  3:  Entergy is not entitled to collect interest on the balance of its unrecovered costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

1. Like rate-case expenses, the unrecovered implementation costs are relatively small and recovered quickly so that adding interest is not reasonable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

2. The statutes do not require interest on unrecovered implementation costs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

3. The 2004 CenterPoint opinion does not mandate recovery of interest on all amounts in a rate case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

CONCLUSION AND PRAYER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

APPENDICES

Appendix A   Interim Order, filed June 12, 2012

Appendix B   Order, filed July 19, 2013

Appendix C   Tex. Util. Code § 39.452

# INDEX OF AUTHORITIES

**Cases:**

*CenterPoint Energy Houston Elec., LLC v. Pub. Util. Comm'n of Tex.,*
    354 S.W.3d 899 (Tex. App.—Austin 2011, no pet.)...... 8, 9, 15, 17, *passim*

*CenterPoint Energy Houston Elec., LLC v. Pub. Util. Comm'n of Tex.,*
    408 S.W.3d 910 (Tex. App.—Austin 2013, pet. denied)............... 44

*CenterPoint Energy, Inc. v. Pub. Util. Comm'n of Tex.,*
    143 S.W.3d 81 (Tex. 2004)................................. 50, 51

*Cities for Fair Util. Rates v. Pub. Util. Comm'n of Tex.,*
    924 S.W.2d 933 (Tex. 1996)................................. 49

*City of Frisco v. Tex. Water Rights Comm'n,*
    579 S.W.2d 66 (Tex. Civ. App.—Austin 1979, writ ref'd n.r.e.). .... 30, 31

*City of Rockwall v. Hughes,*
    246 S.W.3d 621 (Tex. 2008)............................ 17, 33, 35

*Continental Cas. Co. v. Downs,*
    81 S.W.3d 803 (Tex. 2002)................................. 20

*Galbraith Eng'g Consultants, Inc. v. Pochucha,*
    290 S.W.3d 863 (Tex. 2009)................................. 17

*In re Entergy Corp.,*
    142 S.W.3d 316 (Tex. 2004)................................ 1, 2

*Nucor Steel v. Pub. Util. Comm'n of Tex.,*
    168 S.W.3d 260 (Tex. App.—Austin 2005, no pet.). . . . . . . . . . . . . . . . . . .  37

*Pedernales Elec. Coop., Inc. v. Pub. Util. Comm'n of Tex.,*
    809 S.W.2d 332 (Tex. App.—Austin 1991, no writ). . . . . . . . . . . . . . . . .  30

*Pub. Util. Comm'n of Tex. v. GTE-Sw., Inc.,*
    901 S.W.2d 401 (Tex. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43, 50

*Reliant Energy, Inc. v. Pub. Util. Comm'n of Tex.,*
    153 S.W.3d 174 (Tex. App.—Austin 2004, pet. denied). . . . . . . . . . . . . .  49

*R.R. Comm'n of Tex. v. High Plains Natural Gas Co.,*
    628 S.W.2d 753 (Tex. Civ. App.—Austin 1981, writ ref'd n.r.e.) (per curiam)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42

*State v. Pub. Util. Comm'n of Tex.,*
    883 S.W.2d 190 (Tex. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  47

*Tex. Alarm & Signal Ass'n v. Pub. Util. Comm'n,*
    603 S.W.2d 766 (Tex. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38

*Upjohn Co. v. Rylander,*
    38 S.W.3d 600 (Tex. App.—Austin 2000, pet. denied). . . . . . . . . . . . . . .  18

**Statutes:**
Tex. Gov't. Code
    §§ 2001.174(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

Tex. Util. Code
    §§ 11.001-64.158 ("PURA"). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  xi, 1
    § 32.101(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  xii

**Statutes (cont.):**

§ 36.003. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

§ 36.006. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

§ 36.007. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

§ 36.007(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

§ 36.007(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

§ 36.051. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xi, 36

§ 36.201. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

§§ 39.001-.359. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

§ 39.452. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

§ 39.452(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

§ 39.452(b). . . . . . . . . . . . . . . . . . . . . . . . ix, xiii, xiv, 2, *passim*

§ 39.452(i). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

§§ 55.024(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

§§ 56.025(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20


**Rules:**

16 Tex. Admin. Code

§ 25.231(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xii


Tex. R. App. P. 44.1(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23


**Other References:**

*Application of CenterPoint Energy Houston Electric, L.L.C. for a Competition Transition Charge,*

Docket No. 30706, Order at 32 (July 14, 2005). . . . . . . . . . . . . . . . . . . . . . 49


*Application of Reliant Energy HL&P for Approval of Unbundled Cost of Service Rate Pursuant to PURA § 39.201 and Public Utility Commission Substantive Rule § 25.344,*

Docket No. 22355, Order, FoF 98G (Oct. 4, 2001). . . . . . . . . . . . . . . . . . . 49

**Other References (cont.):**

*Complaint of the City of McKinney Against Southwestern Bell Telephone Company,*
   Docket No. 11027, Final Order at CoL 9 (May 17, 1995). . . . . . . . . . . . . . .   49

**ALJ**       Administrative Law Judge at the State Office of Administrative Hearings.

**Competition Customers** Entergy's industrial customers that take energy under Entergy's Large Industrial Power Service ("LIPS") tariff that choose to participate in the Competitive Program.

**Competitive Program** The competitive generation services program required under PURA § 39.452(b) that is designed to move Entergy away from its current monopoly and toward a competitive market. The program allows customers to select generation from a supplier other than Entergy.

**Competitive Tariff** The tariff Entergy proposed to comply with PURA § 39.452(b). The tariff requires Entergy to purchase competitive generation service, selected by participating Competitive Customers, and provide the generation to those customers at a retail price.

**Cost Rider**   The rider proposed by Entergy to recover the costs of implementation and administration of the competitive generation program. This tariff is only applicable to the class of customers that is eligible for the competitive generation program — those who take energy under Entergy's Large Industrial Power Service tariff ("LIPS"). These implementation costs will be charged to the LIPS

class whether or not they choose to participate in the program.

**Competitive Supplier**

The qualifying facilities eligible to supply alternative generation to the Competitive Customers in the Competitive Program.

**Competitive Purchase Agreement**

The agreement that the Competitive Supplier will provide the Competitive Customer's capacity and energy by supplying it to Entergy. Compensation for the capacity would be paid by the customer and not by Entergy.

**Competitive Rate**

The rate charged under the Competitive Program.

**Docket 37744**

PUC Docket No. 37744

**Docket 38951**

PUC Docket No. 38951

**Entergy**

Entergy Texas, Inc., Plaintiff in this case.

**ERCOT**

Electric Reliability Council of Texas. In this case, the term "ERCOT" is used to refer to the interconnected electric grid that is completely within the State of Texas.

**Interim Order**

Interim Order in Docket 38951, AR, Binder 1, Item 77.

**LIPS**

Large Industrial Power Services. This is one of the rate classes in Entergy's tariff. Only

members of this rate class are eligible to participate in the Competitive Tariff.

**Order**    Final Order in Docket 38951. AR, Binder 2, Item 119.

**PFD**    Proposal for Decision.

**PURA**    Public Utility Regulatory Act, Tex. Util. Code §§ 11.001-64.158.

**Rate Design**    After the revenue requirement is determined, the Commission must design the rates — how much of the revenue requirement should be collected from different rate classes and what method to use to collect those amounts.

**Rejected Rider**    Entergy's proposed rider that sought to collect the revenue that Entergy would lose if some customers migrated to the Competitive Program from the customers that are not eligible to participate in the program. The Administrative Law Judge and the Commission rejected this rider.

**Revenue Requirement**    The total amount that regulated rates are designed to give the utility a reasonable opportunity to recover. It can be stated in as the following formula: (rate base × rate of return) + expenses = revenue requirement. *See* PURA § 36.051. ("In establishing an electric utility's rates, the [Commission] shall establish the

utility's overall revenues at an amount that will permit the utility a reasonable opportunity to earn a reasonable return on the utility's invested capital used and useful in providing service to the public in excess of the utility's reasonable and necessary operating expenses.")

**Test Year**

The utility's actual expenses during the most recent 12-month period, called the "test year." 16 Tex. Admin. Code § 25.231(a). The Commission uses this historical information as the starting point for determining the amount of the utility's reasonable and necessary expenses to use in setting rates.

**Tariff**

A document that the electric utility files with the Commission setting out each rate that is subject to the Commission's jurisdiction. *See* PURA § 32.101(a). In this brief "tariff" is used with a modifier like LIPS to describe the rate for a particular rate class (a group of customers with particular characteristics).

## STATEMENT OF THE CASE

This is an administrative appeal challenging the Public Utility Commission of Texas' ("the Commission") order in a contested-case hearing. Texas Utilities Code § 39.452(b) requires Entergy Texas, Inc. ("Entergy") to begin transitioning its generation services to competition. The challenged order determines rates for a Competitive Generation Service program (the "Competitive Program"), the type of costs Entergy can recover as a result of implementing the Competitive Program, and whether interest can be recovered on these amounts.[1]

---

[1] The administrative record in PUC Docket 38951 was entered into evidence as Joint Exhibits 1 and 2, R.R. at 4:25-5:10. The Commission ordered that the record in Docket No. 37744 be included in severed Docket No. 38951. That record was voluminous and contained more that 1,500 filings. The entire administrative record in Docket No. 37744 is included in Docket No. 38951; however, as a courtesy to the Court, the parties have agreed to only copy and file the portions of that record being relevant to this administrative appeal as a supplement to the record in Docket No. 38951. The record consists of the index, five binders of materials including filings, which are referenced as "item," "exhibits," "offers of proof," or "transcripts." Citations to the Administrative Record will be in the form "AR, Item(s) _____, Binder _____" for filings; "AR, Ex(s) _____, Binder _____" for exhibits; "AR, Offer of Proof _____, Binder _____" for offer of proof; and "AR, TR at _____" for transcripts. Cites to the administrative record in PUC Docket 37744 will be "Docket No. 37744, _____ [name of document]." Cites to the Proposal for Decision (PFD) are in Docket 37744. The final order is the Final Order of the Public Utility Commission of Texas (Order) and is at AR, Item 11, Binder 2.

# ISSUES PRESENTED

**Issue 1:** Does the term "costs" as used in Texas Utilities Code § 39.452(b) include Entergy's "lost revenues"?

**Issue 2:** Does the plain language of Texas Utilities Code § 39.452(b) require Entergy to recover implementation costs before it has implemented the competitive generation program?

**Issue 3:** Does the plain language of Texas Utilities Code § 39.452(b) require Entergy to receive interest on the costs of implementing the competitive generation program?

**STATEMENT OF FACTS**

This case is about a competitive generation service tariff (the "Competitive Tariff") that the Commission approved for Entergy. Entergy is an investor-owned electric utility that provides rate-regulated electric service to retail customers located in southeastern Texas.[2] Entergy is located outside of the electrical grid serving most of Texas, known as the Electric Reliability Council of Texas ("ERCOT").

All investor-owned Texas electric utilities were ordered to transition to a competitive market beginning in 1999.[3] As a result, electric utilities had to unbundle their generation, transmission, distribution, and retail provider services. Utilities within ERCOT could handle this transition more easily than utilities like Entergy that operate outside of ERCOT.

The legislature eventually became concerned that Entergy's service area was not ready to transition to competition. *See In re Entergy Corp.*, 142 S.W.3d

---

[2] Docket No. 37744, ETI Ex. 4, Joseph F. Domino Direct at 1.

[3] Public Utility Regulatory Act, Tex. Util. Code §§ 11.001-64.158 (hereinafter referred to as "PURA") §§ 39.001–.359.

316, 320 (Tex. 2004). The legislature amended the Public Utility Regulatory Act ("PURA") to delay Entergy's transition to competition.[4] PURA's amendments also provided that the Commission would continue to set Entergy's rates under traditional cost-of-service regulation until Entergy fully transitions to a competitive market.[5]

However, discrepancies between electricity prices in the Entergy service area and those within ERCOT concerned customers operating under Entergy's monopoly. The large industrial customers are an important segment of the economy, and they wanted the ability to shop for electricity in a competitive market.

Recognizing this problem, the legislature made an effort to move Entergy closer to becoming a fully competitive utility with regard to generation. By enacting PURA § 39.452, the legislature required Entergy to propose a competitive generation tariff. PURA § 39.452(b) states in pertinent part:

---

[4] PURA § 39.452(i).

[5] PURA § 39.452(a).

An electric utility subject to this subchapter shall propose a competitive generation tariff to allow eligible customers the ability to contract for competitive generation. The commission shall approve, reject, or modify the proposed tariff not later than September 1, 2010. The tariffs subject to this subsection may not be considered to offer a discounted rate or rates under Section 36.007, and the utility's rates shall be set, in the proceeding in which the tariff is adopted, to recover any costs unrecovered as a result of the implementation of the tariff. The commission shall ensure that a competitive generation tariff shall not be implemented in a manner that harms the sustainability or competitiveness of manufacturers that choose not to take advantage of competitive generation. Pursuant to the competitive generation tariff, an electric utility subject to this subsection shall purchase competitive generation service, selected by the customer, and provide the generation at retail to the customer. . .[6]

Entergy is the only electric utility that would be impacted by the competitive generation program ("Competitive Program") requirement established in PURA § 39.452(b). The statute is essentially a legislative compromise requiring Entergy to engage in partial competition by offering some customers a choice of generation providers. The Competitive Tariff

---

[6] PURA § 39.452(b).

requires Entergy to allow customers to select generation from another producer. Then, Entergy provides that generation to the customer at a retail price.[7] This important step towards a transition to full competition allows at least some of Entergy's customers relief from Entergy's monopoly in the region.

## A.  Entergy's proposed Competitive Program.

To comply with PURA § 39.452(b)'s requirements, Entergy proposed a Competitive Program as part of its rate case in PUC Docket No. 37744. The Competitive Program consisted of three parts: (1) a Competitive Tariff; (2) a rider designed to recover implementation and administration costs (the "Cost Rider"); and (3) a rider the Commission rejected that proposed to recover Entergy's lost revenues from customers that are ineligible for the Competitive Program (the "Rejected Rider").

The Competitive Tariff requires Entergy to purchase Competitive Generation Service, selected by the participating customers ("Competition

---

[7]  *Id.*

Customers"), and provide the generation at retail to the customer.[8] Pursuant to the statute, the tariff could not be considered a discount rate – meaning it could not be discounted by a percentage rate to all Competitive Customers.[9] Further, it could not be implemented in a manner that harms the sustainability or competitiveness of manufacturers that choose not to take advantage of the program.[10] The statute permits Entergy to recover "any costs unrecovered as a result of the implementation of the tariff."[11]

Entergy designed its Cost Rider to recover the costs associated with implementing and administering the Competitive Program. Entergy proposed that all of these costs would be recovered by the eligible Competition Customers, whether or not they took the competitive generation service.[11]

Entergy sought an additional rider that was rejected because it was

---

[8] AR, Item 77, Binder 1, Interim Order at 4; PURA § 39.452(b).

[9] *Id*; PURA § 36.007.

[10] AR, Item 77, Binder 1, Interim Order at 4; PURA § 39.452(b).

[11] *Id*.

inherently inequitable and violated PURA's rate-making principles that require just and reasonable rates.[12] Under the Rejected Rider, Entergy sought to recover lost base-rate revenues from the customers that would *not* be eligible to benefit from the program.[13]

> This Competitive Generation Service Unrecovered Service Cost Rider ("Rider CGSUSC" or "Rider") defines the procedure by which Entergy Texas, Inc. ("Company") shall implement and adjust rates for **recovery of lost base rate revenue** resulting from customers participating in the Company's Competitive Generation Service ("CGS Program"). The purpose of this Rider is to provide a mechanism for recovery of such **lost base rate revenues** that were included in the Company's last general rate case proceeding before the Public Utility Commission of Texas ("PUCT").[14]

Through this Rejected Rider, Entergy sought to recover revenues it could have billed to the Competitive Customers "but for" the Competitive Program. Entergy later recharacterized this same claim as what it now calls "embedded

---

[12] PFD at 24.

[13] AR, TIEC Ex. 15, Binder 4, Jeffry Pollock Supp. Direct at 17 citing Docket No. 37744; AR, ETI Ex. 9, Binder 1 (Partial Exhibits & Transcripts from Docket 37744) at Exhibit PRM-1; Plaintiff's Brief at 5.

[14] AR, ETI Ex. 9 at Exhibit PRM-1 at 5, Binder 1 (Partial Exhibits & Transcripts from Docket 37744) (emphasis added).

generation costs."

## B. The Administrative Law Judge rejected Entergy's initial Competitive Program.

In Entergy's rate case in PUC Docket No. 37744, Entergy settled all matters except for issues regarding the Competitive Program. After a hearing on the Competitive Tariff and the associated riders, the Administrative Law Judge ("ALJ") issued a Proposal for Decision ("PFD") recommending to the Commission that Entergy's entire Competitive Program be rejected.[15] The ALJ refused to recommend that the Competitive Program be adopted because Entergy's Rejected Rider would prevent competition by shifting collection of all the revenues it would otherwise have recovered from Competitive Customers to the customers that *do not* participate in the Competitive Program. The ALJ determined that the Rejected Rider imposed unreasonable rates on the customers who would not receive the benefit of the program, and therefore, "runs contrary to the fundamental rate-making principle of cost causation and may harm the competitiveness of non-participating

---

[15]  PFD, CoL 10 at 45.

manufacturers."[16]

Since Entergy had settled the remainder of the rate case in Docket No. 37744, the Commission severed the issues pertaining to the Competitive Program into PUC Docket No. 38951.[17]

## C.     The Commission rejected Entergy's statutory interpretation.

The Commission issued an Interim Order in Docket 38951 that reversed the ALJ's recommendation in Docket 37744 to reject the Competitive Program.[18]  The Commission had the benefit of this Court's 2011 decision in *CenterPoint Energy Houston Electric, LLC v. Public Utility Commission of Texas*, 354 S.W. 3d 899 (Tex. App.—Austin, 2011, no pet.) ("*CenterPoint 2011*") in determining that in PURA "the legislature expressly distinguishes 'costs' from

---

[16]  PFD at 24.

[17]  *Application of Entergy Texas, Inc. for Approval of Competitive Generation Tariff (severed from Docket No. 37744).*  Docket 37744, Order No. 14, Memorializing Decision Granting Motion to Sever; Docket 38951, Order No. 1 Establishing Docket.  (The Commission ordered that the record in Docket No. 37744 be included in severed Docket No. 38951.  That record was voluminous and contained more that 1,500 filings.  The entire administrative record in Docket No. 37744 is included in Docket No. 38951; however, as a courtesy to the Court, the parties have agreed to only copy and file the portions of that record being relevant to this administrative appeal.

[18]  AR, Item 77, Binder 1, Interim Order at 6.

'revenues.'"[19] Therefore, the term 'costs,' as used by the legislature in PURA § 39.452(b) "only provides for 'costs unrecovered as a result of the implementation of the tariff' and does not specifically provide for the utility to recover lost revenues or any other type of costs."[20]

**D. Stipulations and settlements in Docket No. 38951 created a very different Competitive Program than the program rejected by the ALJ — one that resulted in no unrecovered costs.**

The Competitive Program that the Commission accepted was significantly different than the program the ALJ rejected in Docket 37744. In severed Docket No. 38951, the parties negotiated an acceptable framework for the Competitive Program. The parties made certain stipulations and settlement agreements that were adopted in part by the Commission.[21] The originally proposed Competitive Program was an energy-only program, but the parties agreed to change the program to an energy and capacity-based program. The testimony demonstrated that under this new agreement, the

---

[19] AR, Item 77, Binder 1, Interim Order at 6; PURA § 39.452(b); *CenterPoint Energy Houston Electric, LLC v. Public Utility Commission of Texas*, 354 S.W. 3d at 904-05.

[20] *Id.*

[21] AR, Item 119, Binder 2, Order at 6.

Competitive Customer would self-supply its own capacity and energy; therefore, Entergy would not incur generation costs.[22]

This newly negotiated program involved two contracts between the participants – one between the Competitive Customer and the Competitive Supplier, and the other between Entergy and the Competitive Supplier (the "Competitive Purchase Agreement").[23] Under the Competitive Purchase Agreement, the Competitive Supplier would provide the Competitive Customer firm power and enter into a contract with Entergy (or on Entergy's behalf) to become a firm-power resource for Entergy.[24] The Competitive Purchase Agreement is a contract for the purchase of energy and capacity for the same amount of power specified in the Competitive Customer and Competitive Supplier agreement.[25]

---

[22] AR, TIEC Ex. 15, Binder 4, Pollock Supp. Direct at 7.

[23] *Id*. at 14-38.

[24] *Id.* at 7, 12.

[25] AR, Item 119, Binder 2, Order at 17, FoF 42B(2)-(3)

## 1. Participants in the Competitive Program.

The parties also agreed which customers and which suppliers could participate in the Competitive Program. Only the industrial customers that took service under Entergy's large industrial power services ("LIPS") tariff could participate.[26] The Competitive Suppliers would be the Qualifying Facilities connected with Entergy's system.[27] The program would be limited to 10 Competitive Customers and capped between 80 MW and 150 MW.[28]

## 2. Costs recovered from the Competitive Customers.

The parties also stipulated that Entergy was projected to operate at an incremental net resource deficiency of 260 MW in 2012 and 504 MW in 2013.[29] In order to remedy this capacity deficiency and provide the needed base-load capacity to serve its customers, Entergy would have to buy from other

---

[26] AR, Item 113, Binder 2, Stipulation and Settlement Agreement between Commission Staff, Entergy Texas, Inc. and Texas Industrial Energy Consumers, Attachment 1 at 1.

[27] AR, Item 119, Binder 2, Order at 17, FoF 41A.

[28] *Id.* at 22, FoF 47.

[29] AR, Item 119, Binder 2, Order at 22, FoF 43.

generators.[30] The agreed Competitive Program would offset this deficiency and make Entergy less dependent on its system affiliates to purchase enough power to supply its customers. Under the revised Competitive Program, the extra capacity that Entergy already had to purchase elsewhere because of its deficiency, would be purchased under the Competitive Purchase Agreement and passed through directly to the Competitive Customers at retail. Entergy would save money because it could use its existing generation to serve its established and new customers without the need to purchase excess generation to maintain reliable service.[31]

The only production-related costs that Entergy would have to incur to serve the Competitive Customers would be for backup power.[32] However, the parties stipulated that the Competitive Customer would pay Entergy the full price of backup power in the event of an outage through the Fixed Cost

---

[30] AR, TIEC Ex. 15, Binder 4, Pollock Supp. Direct at 24-25.

[31] *Id*. at 25

[32] AR, TIEC Ex. 16, Binder 4, Pollock Supp. Rebuttal at 6.

Contribution and the Unserved Energy rate.[33]  Thus, under the approved

program, all of Entergy's generation costs are covered.[34]

**E.   The Commission adopted the revised Competitive Tariff but not the Rejected Rider relating to embedded generation costs.**

Although the Commission adopted Entergy's revised Competitive Tariff

in Docket No. 38951,[35] it rejected Entergy's rider that would permit it to

recover lost base-rate revenues  from customers that were *ineligible* to even

participate in the program.  The Commission rejected Entergy's definition of

unrecovered costs: embedded production costs and other related base-rate

costs.[36]  Instead, the Commission determined that the only costs that were

recoverable were the costs of implementation and administration of the

Competitive Program.[37]

---

[33]  AR, TIEC Ex. 15, Binder 4, Pollock Supp. Direct at 15.

[34]  AR, TIEC Ex. 15, Binder 4, Pollock Supp. Direct at 15-16.

[35]  AR, Item 119, Binder 2, Order at 26-27.

[36]  *Id.* at 23, FoF 51 and CoL 2.

[37]  *Id.*

**F.    Entergy's implementation costs do not accrue until the statute is implemented, and interest is not allowed.**

The Commission also held that Entergy was not entitled to begin accruing costs for the implementation of the Competitive Program until the date the Competitive Tariff was actually implemented.[38] The Commission denied Entergy's request to recover its costs for developing the program retroactively back to November 10, 2010.[39] Entergy had already been recovering approximately $300,000 per year for developing the Competitive Program as part of its operating expenses included in base rates approved in Docket No. 39896.[40] The Commission also found that, due to the relatively limited regulatory lag, the unrecovered costs should be treated consistently with rate-case expenses. Therefore, the Commission found that it was inappropriate for Entergy to recover interest on the balance of its costs unrecovered as a result of the implementation of the Competitive Tariff.[41]

---

[38] AR, Item 119, Binder 2, Order at 25, FoF 57A.

[39] AR, Item 119, Binder 2, Order at 9.

[40] AR, ETI Ex. 101, Dennis R. Roach Supp. Direct at 15.

[41] AR, Item 119, Binder 2, Order at 25, FoF 57C.

## SUMMARY OF THE ARGUMENT

The Commission's order should be upheld because it correctly determined that the only unrecovered costs that Entergy has as a result of implementing the Competitive Program are the costs to implement and administer the program. The evidence is clear that under the revised program considered by the Commission in Docket No. 38951, Entergy would have no other unrecovered costs.

What Entergy claims are "costs" are really revenues that it would have recovered but for customers migrating to the Competitive Program. This Court has already rejected the argument that utilities should recover the losses and sacrifices sustained in implementing a legislatively mandated program. *CenterPoint 2011,* 354 S.W.3d at 903. If the legislature intended for Entergy to recover its lost revenues, it would have specifically indicated that intent as it has in other sections of PURA. *Id*.

The Commission's statutory interpretation that the only recoverable costs are those resulting from the implementation and administration of the Competitive Program is reasonable. This interpretation is in accordance with

the statute's plain language, consistent with case law, and supports the statutory intent to promote competition. Entergy's interpretation on the other hand, is anticompetitive and seeks to charge customers that are not eligible for the program unjust and prejudicial rates in violation of traditional rate-making principles. This unfair cost-shifting approach was not mandated by the legislature, and should not be permitted.

Nor should Entergy be allowed to circumvent the plain language of the statute and recover development costs accrued prior to the date the program is actually implemented. Entergy has already recovered its development expenses as operating costs in previous rate cases. It should not be permitted to recover them under the statute.

Moreover, Entergy is not entitled to interest on implementation costs under the statute. The costs of implementation are *de minimis* and can be recovered quickly. Because Entergy will not suffer regulatory lag, these expenses should be treated as rate-case expenses. It has long been the Commission's practice to deny interest on rate-case expenses. This is especially true here, as the statute is not designed to put Entergy in a better

position than it would have been in prior to implementing the Competitive Program. The Commission's order is correct and should be upheld.

**ARGUMENT**

**A.  Standard of Review**

The statutory construction of PURA § 39.452(b) is at the core of this case. That section permits a utility implementing a Competitive Program "to recover any costs unrecovered as a result of the implementation of the tariff." *Id*. When construing statutes, a court's primary objective is to give effect to the legislature's intent. *CenterPoint 2011*, 354 S.W.3d at 903; citing *Galbraith Eng'g Consultants, Inc. v. Pochucha*, 290 S.W.3d 863, 867 (Tex. 2009). "The plain meaning of the text is the best expression of legislative intent unless a different meaning is supplied by legislative definition or is apparent from the context, or unless the plain meaning would lead to absurd or nonsensical results that the legislature could not have intended." *CenterPoint 2011*, 354 S.W.3d at 903; citing *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625-26 (Tex. 2008). Courts "look to the entire act in determining the legislature's intent with respect to the specific provision." *CenterPoint 2011*, 354 S.W.3d at 903;

citing *Upjohn Co. v. Rylander*, 38 S.W.3d 600, 607 (Tex. App.—Austin 2000, pet. denied).

**B.    Issue 1:  The Commission reasonably refused to include Entergy's lost revenues in the Competitive Tariff.**

**1.    The plain language of the statute refers to costs, not lost revenues.**

The crux of this lawsuit is the interpretation of PURA § 39.452(b)'s language that, for the Competitive Rates, "the utility's rates shall be set … to recover any *costs* unrecovered as a result of the implementation of the tariff[42] (emphasis added).  The statute only refers to costs.  Thus, the Commission reasonably decided that lost revenues are not costs.

Although Entergy attempts to convince the Court that "costs" and "revenues" are synonymous in this case, it concedes that costs and revenues are not the same thing.[43]  Further, when the statutory language of PURA § 39.452(b) provides recovery of "any costs," the term "any" modifies "costs."

---

[42]  PURA § 39.452(b) (emphasis added).

[43]  Appellant's Brief at 26 ("Though 'costs' and 'revenues' may not be the same in all contexts, they *are* the same in the context of what ETI was seeking in this case.").

If the amounts Entergy seeks are not costs, the modifier "any" will not expand the statute to include those amounts that are not "costs."

### a. The *CenterPoint 2011* case holds that lost revenues are not costs.

In reaching its conclusion that Entergy's lost revenues should not be recovered as costs, the Commission relied on this Court's analysis that rejected recovery of lost revenues as expenditures in another section of PURA.[44] This Court held that unrecovered costs associated with the implementation of an energy-efficiency program are limited to actual expenditures made to satisfy the goals of the program. *CenterPoint 2011*, 354 S.W.3d at 903. In that case, this Court rejected an interpretation of "costs" that included "the losses or sacrifices sustained as a result of an endeavor" and adopted the narrow interpretation of "costs" related to actual expenditures associated with attempts to comply with the endeavor. *Id.* The Commission, relying on this holding, made the same reasonable interpretation in this case.

Entergy's argument that *CenterPoint 2011*'s holding is somehow

---

[44] AR, Item 119, Binder 2, Order at 7.

distinguishable because it was interpreting a different section of PURA is meritless. The reasoning of *CenterPoint 2011* applies here. Like CenterPoint, Entergy takes the position that "costs" includes its losses or sacrifices sustained by implementing the program. *Id*. Entergy admits in its brief that it is seeking lost revenues: "The same logic, applied to the broader language of the CGS statute, leads to the inescapable conclusion that ETI is entitled to recover all the costs it incurred (or stated differently, revenues it would have received to cover those costs) but for the CGS program."[45] This Court rejected that argument in *CenterPoint 2011*. *CenterPoint 2011*, 354 S.W.3d at 903-04.

Courts must consider statutes as a whole, and not words in isolation. *Continental Cas. Co. v. Downs*, 81 S.W.3d 803, 805 (Tex. 2002). At least two other sections of PURA differentiate between "costs" and "revenues" by permitting recovery of *"all costs* incurred and *all loss of revenue"* and to "implement a mechanism to replace the reasonably projected *increase in costs or decrease in revenue.*" *CenterPoint 2011*, 354 S.W.3d at 904 (emphasis added); PURA §§ 55.024(b) and 56.025(e) (emphasis added). *CenterPoint 2011*

---

[45] Appellant's Brief at 27.

concluded that the term "costs," as used by the legislature in PURA, does not include lost revenues. *CenterPoint 2011*, 354 S.W.3d at 904. This distinction applies to PURA as a whole.

This Court determined that when the legislature does not specifically provide for recovery of lost revenues in addition to costs, then the only recoverable costs are those out-of-pocket expenses associated with the implementation of the program. *Id*. The Commission's reasonable statutory construction is consistent with this Court's analysis and should be affirmed.

### b. What Entergy seeks are lost revenues, not costs.

Entergy is not entitled to recover its lost revenue simply because it recharacterized that lost revenue as costs to escape the *CenterPoint 2011* holding. When Entergy first asked the Commission to set these Competitive Rates (in 2010), it called the amounts it sought to recover "lost base rate revenues."[46] Although it now calls those amounts costs, they still represent

---

[46] "This Competitive Service Unrecovered Service Cost Rider ('Rider CGSUSC' or 'Rider') defines the procedure by which Entergy Texas, Inc. ('Company') shall implement and adjust rates for **recovery of lost base rate revenue** resulting from customers participating in the Company's Competitive Generation Service ('CGS Program'). The purpose of this Rider is to provide a mechanism for recovery of such **lost base rate revenues** that were included in the Company's last general rate-case proceeding before the

revenues Entergy would have recovered but for customers choosing to take service under the Competitive Tariff rather than the LIPS tariff. Entergy proposed to recover: "the embedded generation-related costs and any other related base rate costs that would have been recovered through traditional rates charged to Competitive Customers that will no longer be recovered from the Competitive customers."[47] Under either phraseology, what Entergy seeks are lost revenues. And the plain language of the statute does not permit recovery of lost revenues. The Commission's order should be affirmed.

## 2. Entergy's issue must be denied because it failed to show harm.

Entergy has failed to demonstrate harm from the Commission's order. A showing that "substantial rights have been prejudiced" is required to prevail in an administrative appeal.[48] Moreover, this Court may not reverse the district court's affirmance of the Commission's order unless it concludes that the claimed error "probably caused the rendition of an improper

Public Utility Commission of Texas ('PUCT')."
Docket No. 37744, ETI Ex. 9 at Exhibit PRM-1 (emphasis added).

[47] AR, ETI Ex. 91, Binder 3, Phillip May Supp. Direct at 5-6.

[48] Tex. Gov't Code § 2001.174(2)

judgment."[49]  Entergy must not prevail on its Issue One because it failed to demonstrate how the Commission's order harms it.

### a. Entergy has not shown that it will not recover all its costs under the Competitive Tariff.

The burden of proof was on Entergy at the Commission,[50] and Entergy failed to meet its burden.

Testimony by Entergy's witness Phillip May revealed that the utility did not expect the Competitive Tariff to *only* recover amounts that it would have recovered from the customers that existed when the Competition Program was implemented.  He admitted that Entergy's proposal would recover lost revenues even if the customer joining the Competitive Rate program, had not previously received service from Entergy.[51]

> Q:  Okay.  So your proposal for the [Rejected] Rider is to calculate the difference between what would have billed -- been billed under traditional LIPS service and the amounts collected under the [competitive] service?

---

[49] Tex. R. App. P. 44.1(a)

[50]  *See* PURA § 36.006.

[51] Docket No. 37744, Hearing on the Merits, TR, Vol. 3 at 165:23-166:11 (Jul. 16, 2010).

A:    That's a fair characterization.

Q:    Okay. So let me get this straight. Under the company's proposal, if a brand-new industrial customer came to you that had never received service from [Entergy] and they said, "We want to sign up for [the Competitive Program]," [Entergy] would still seek to recover lost revenues based on LIPS from that customer?

A:    Yeah, I believe that is consistent with the program.[52]

Mr. May's testimony proves that Entergy could recover amounts under the Competition Tariff in excess of the amounts that its cost-of-service rates were designed to recover.

Cities' witness Karl Nalepa testified that "[Entergy]'s definition of unrecovered costs is unreasonable."[53] It is unreasonable because Entergy would continue to incur production costs for five years or more for a customer that it does not serve.[54] TIEC witness Jeffry Pollock testified that "unrecovered costs" should not include Entergy's hypothetical lost

---

[52] *Id.*

[53] AR, Cities Ex. 6C, Binder 3, Karl Nalepa Supp. Direct at 5.

[54] *Id.*

revenues.[55]  He also testified that the costs unrecovered as a result of the implementation of the tariff should only include the expenditures actually made by Entergy to implement and maintain the Competitive Program, and the expense of providing backup power to the Competitive Customers.[56]

Entergy misleads the Court when it argues that because the ALJ agreed that there could be lost revenues, that  means it will have lost revenues.[57]  For one thing, the ALJ considered the program that Entergy originally proposed in Docket 37744.  That program was significantly different from the revised program the Commission approved based on numerous settlements in Docket 38951.  Throughout its brief, Entergy refers to testimony and findings in Docket No. 37744 as though they are still relevant to the approved Competitive Program, but that is not the case.  The Commission was not considering the same program the ALJ was presented with.  The testimony proved that under the revised program, there would be no unrecovered costs.

---

[55]  AR, TIEC Ex. 15, Binder 4, Pollock Supp. Direct at 14.

[56]  *Id*. at 14–15.

[57]  Appellant's Brief at 25, 26

### b. The structure of the revised Competitive Tariff and the facts ensure that Entergy will have no unrecovered costs.

Contrary to statements in its brief, Entergy failed to prove that any of the amounts included in its cost-of-service revenue requirement would not be recovered under Competitive rates. Entergy ignores several factors that will allow the utility to recover all of those amounts even with Competitive Rates.

One factor that allows Entergy to recover all of its revenue requirement is that even if some customers buy under the Competitive Tariff, the utility is expected to sell more electricity over time. Cities' witness Karl Nalepa explained that load growth would replace the revenues once recovered from a customer that is leaving the system.[58]

Another factor is that Entergy may incur lower costs if customers leave. Entergy should not be permitted to collect additional rates for capacity that it no longer needs.[59] Mr. Nalepa testified that "[Entergy's] proposal to include lost revenues in its definition of unrecovered costs would require all other

---

[58] AR, Cities Ex. 6C, Binder 3, Nalepa Supp. Direct at 8.

[59] *Id*. at 9.

customers to pay for phantom costs incurred to serve a customer that is no longer being served by [Entergy]."[60]  If customers migrate to the Competitive Program, that means that Entergy will have to purchase less electricity from others and thus save money; it will relieve Entergy from its existing capacity deficit.

Entergy will have to purchase less electricity at wholesale if Competition Customers use the Competition Tariff.  The parties stipulated that Entergy has an incremental net resource deficiency of 260 MW in 2012 and 504 MW in 2013.  The Stipulation and Settlement reached in Docket 38951 limits the amount of electricity subject to the Competitive Program to 115 MW— less than the amount Entergy would have to purchase from others.[61]  As a result of the Competitive Program, Entergy will incur savings because it will not have to buy as much electricity at wholesale.

Additionally, the revised program adopted by the Commission allows Entergy to recover its production costs through other charges.  The parties

[60]  *Id*. at 8.

[61]  AR, Item 119, Binder 2, Order at 17.

agreed that the Competitive program would allow Entergy to rely on Competitive Purchase Agreements as a firm power supply for generation planning purposes. The testimony showed that under this agreement, Entergy would not incur production costs other than backup power.[62]

Mr. Pollock testified that there would be no unrecovered costs existing after startup. Ongoing and backup power costs are paid by the Competitive Customer.[63] The Competitive Customer (with the exception of capacity credit and fixed fuel factor) would pay Entergy a retail rate that includes all other charges the customer would pay as a firm customer, including a transmission and distribution rate and all other applicable tariffs.[64] The Competitive

---

[62] The Competitive Customers will buy backup power from Entergy when the provider cannot provide the competitive capacity in a given hour. These expenses will be recovered through the Unserved Energy Rate and a Fixed Cost Contribution Fee which are discussed in the Stipulation and Settlement between Commission Staff, Entergy Texas, Inc., and Texas Industrial Energy Consumers. *See* Order at 17. Competitive Customers will pay 105% of the avoided energy cost plus an O&M Adder. Additionally, the Competitive Customer will pay a Fixed Cost Contribution Fee of $1.10 per kW-Month of Competitive Contract Capacity. Thus, the Competitive Customers pay all of the incremental variable costs associated with back-up power plus a contribution to generation fixed costs.

[63] AR, TIEC Ex. 15, Binder 4, Pollock Supp. Direct at 15-16.

[64] *Id*. at 16.

Customer's energy costs pass through to the customers, meaning Entergy would not have to pay the supplier for capacity. "There would be no other unrecovered costs."[65]

Entergy ultimately seeks to avoid the reality of competition and maintain its monopoly. Although the legislature has ordered it to make a partial transition to competition, Entergy believes it should not lose a penny in the process. Entergy pretends that the legislature mandated that it charge its lost revenues from those migrating to competition to the customers that are *ineligible* to participate in the program.[66] It goes further by insinuating that there is no feasible way to implement the program in conformity with the statute "without, in some manner, creating a preferential rate or assigning costs to customers that may not cause them."[67] This is nonsense. The legislature made no such mandate—the parties, not the legislature,

---

[65] *Id.*

[66] Appellant's Brief at 19.

[67] *Id.*

determined which class would be eligible.[68] Despite Entergy's claim that the statute mandated an unfair result, the Commission was able to approve a program structure without causing harm to the ineligible classes.

Nonetheless, Entergy seeks a free lunch. Entergy seems content with avoiding the statutory mandate that it move to partial competition by designing an unfair program that is sure to be rejected. Further, if Entergy actually has to enter the competitive market, it wants to assure that it does so without experiencing the financial reality of competition. To pursue these objectives, Entergy goes so far as to mischaracterize former Chairman Smitherman's open meeting comments regarding the program.[69] It should be noted that Commissioners' thought processes are irrelevant in the judicial determination of the reasonableness of an agency order. *Pedernales Elec. Coop., Inc. v. Pub. Util. Comm'n of Tex.*, 809 S.W.2d 332, 342 (Tex. App.—Austin 1991, no writ); *City of Frisco v. Tex. Water Rights Comm'n*, 579 S.W.2d 66, 72 (Tex. Civ.

---

[68] AR, Item 113, Binder 2, Stipulation and Settlement Agreement between Commission Staff, Entergy Texas, Inc. and Texas Industrial Energy Consumers, Attachment 1 at 1.

[69] Appellant's Brief at 19-20.

App.—Austin 1979, writ ref'd n.r.e.). Yet, Entergy states that Chairman Smitherman acknowledged that Entergy should not have to pick up the tab for the program if it could not find an equitable way to pay for it: "[I]t's clear you're not supposed to shoulder the burden of this [program] …" and "[U]nder no circumstances will you eat it [the costs of the program]"[70]

These comments bear no relation to Entergy's attempt to collect lost revenues from customers that are ineligible for the program. In context, former Chairman Smitherman said that Entergy would not have to "eat" the implementation costs *if* none of the LIPS customers opted to migrate to the Competitive Program.[71] In response to Entergy's plan to collect embedded generation costs from ineligible customers, former Chairman Smitherman replied, "Yeah, I'm not comfortable with that."[72] He further stated, "I don't think we can put them on residential customers. I don't think that was the

---

[70] *Id.* at 20 citing Supp. AR Part IV, Vol. F (Docket No. 37744, Nov. 10, 2010 Open Meeting Tr. at 179 & 210.

[71] *Id.* at 210.

[72] *Id.* at 212.

intent."[73]   And Chairman Nelson stated, "I wouldn't approve that rider, period."[74] Entergy's assertion that the Commission acknowledged a statutory intent to place the burden of costs on customers that did not cause them is disingenuous.

Entergy failed to prove that it would be aggrieved by the Commission's statutory interpretation.   Entergy relies solely on potential harm that may have resulted from the program proposed to the ALJ in Docket No. 37744.  The revised program the Commission considered was structured so that Entergy would not have any unrecovered costs other than implementation and administration of the program.  Entergy has not been harmed and its appeal of this issue should be denied.

3.   **The Commission's interpretation of the statute is reasonable, and Entergy's interpretation is *unreasonable*.**

a.   **The Commission's interpretation follows the statute's plain language that limits recovery to costs.**

The Commission's plain language interpretation is consistent with the

---

[73] *Id*. at 213.

[74] *Id*. at 212.

legislative goal of promoting competition without imposing unjust and unreasonable rates. Courts should reject plain language interpretations that "would lead to absurd or nonsensical results that the legislature could not have intended." *City of Rockwall*, 246 S.W.3d at 625-26. Here, the Court should uphold the Commission's reasonable interpretation because Entergy seeks to recover "lost revenues," not "unrecovered costs," which is inconsistent with the plain language of the statute.

### b. The Commission's interpretation of the statute is reasonable.

The Commission's interpretation is consistent with the objective of promoting competition, it is consistent with legal precedent, and it is consistent with traditional rate-making principles. It does not allow Entergy to shift rates from one class of customers to another. Nor does the Commission's interpretation allow Entergy to recover "costs" that it never incurred. An interpretation making those allowances would lead to an absurd result.

### c.     Entergy's interpretation of the statute is *un*reasonable.

Entergy's statutory interpretation conflicts with the plain language of the statute. It is unreasonable for Entergy to include embedded generation costs in its definition of unrecovered "costs." As demonstrated above, what Entergy actually seeks to recover are lost revenues. "[T]he term "costs," as used by the legislature in PURA, is not intended to include lost revenues." *CenterPoint 2011*, 354 S.W.3d at 904.

Entergy also ignores the statutory term "unrecovered." Entergy failed to meet its burden of proof to demonstrate that it would have unrecovered costs other than those costs to implement and administer the Competitive Program. Substantial evidence showed that under the revised program approved by the Commission "there would be no other unrecovered costs."[75]

Entergy should not be put in a better position than it would be without the Competitive Program. This was not the intent of the legislature, and would be contrary to the statute's plain language. If base rates were set to recover a certain amount of revenues from LIPS service but the revenues did

---

[75] AR, TIEC Ex. 15, Binder 4, Pollock Supp. Direct at 15-16.

not meet the company's targets, Entergy would not be allowed to recover those amounts or its carrying costs on the lost revenue.

But Entergy argues that its captive customers—those not eligible for the Competitive Program—should absorb substantial amounts of money in extra rates to cover Entergy's hypothetical lost revenues caused by migration of members of the LIPS rate class to the Competitive Program. Entergy asserts that the Rejected Rider is designed to recover base-rate costs that its Competitive Customers would avoid by opting into the competitive generation structure "from non-participating customers."[76] Entergy would determine the difference between what would have been billed under traditional LIPS service and the amounts collected under the Competitive Program. In other words, Entergy's proposed rider would unfairly penalize the majority of its customers so that Entergy would not lose any potential revenue. This interpretation does not promote competition. It is the type of absurd and nonsensical result that must be rejected because it could not have been what the legislature intended. *City of Rockwall*, 246 S.W.3d at 625-26.

---

[76] Appellant's Brief at 6-7.

**4. Entergy cannot use traditional rate-making concepts to avoid the Legislature's mandate to transition to competition.**

Entergy's argument that its lost revenues are unrecovered costs rests on conflating two different aspects of rate-making: Entergy conflates the test-year expenses used to determine a utility's revenue requirement with the last part of setting rates—rate design. To set regulated electric utility rates, the Commission first decides how much revenue the utility needs to recover. This amount results from the rate of return multiplied by the utility's invested capital (rate base) plus the utility's reasonable and necessary operating expenses:

(rate base × rate of return) + expenses = revenue requirement[77]

After the revenue requirement is determined, the Commission must design the rates—how much of the revenue requirement should be collected from different rate classes and what method to use to collect those amounts.

Although Entergy is correct that the Commission looks to the utility's actual expenses in a 12-month test year to begin its determination of the

---

[77] *See* PURA § 36.051.

utility's reasonable and necessary expenses to include in the revenue requirement, the Commission does not determine which rate class caused the expenses to be incurred when it determines the revenue requirement. The revenue requirement does not assign certain test-year expenses to a rate class like the LIPS class that is eligible to participate in Competitive Rates.

Rate classes are, instead, used to design rates—to devise a dollar-per-unit charge so that the utility will have a *reasonable* opportunity to recover the total amount of its revenue requirement. Although cost causation can be considered in designing rates, "[c]ost is not the only factor that is pertinent to the Commission's decision; the Commission may also consider the purpose for which the service is received, the quantity received, the time of use, and the consistency and regularity of use, among other factors." *Nucor Steel v. Pub. Util. Comm'n of Tex.*, 168 S.W.3d 260, 268 (Tex. App.—Austin 2005, no pet.).

In one case the Texas Supreme Court recognized that "[r]ate design is a complex problem that involves many factors," and mentioned the cost of service, the purpose for which the service or product is received, the quantity

or amount received, the different character of the service furnished, the time of its use, when the peak of the load occurs, the constancy and regularity of the use made by the consumer, or any other matters. *Tex. Alarm & Signal Ass'n v. Pub. Util. Comm'n*, 603 S.W.2d 766, 772 (Tex. 1980). Thus, the fact that a rate class is assigned certain costs in rate design does not mean that the customer *caused* those costs to be incurred.

Entergy incorrectly argues that: "[J]ust as test-year expenses determine what a utility's anticipated future revenue requirement will be for a particular *class*, a utility's anticipated revenue requirement for a class of customers establishes what are *indisputably the costs of serving those customers.*"[78] (emphasis added). This misleading statement underpins Entergy's argument that it will inevitably fail to recover all amounts it incurs *to serve a particular customer* if that customer opts for Competitive Generation Service.

Moreover, throughout its brief, Entergy attempts to use traditional rate-making concepts as both a sword and a shield. Entergy relies on traditional rate-making principles when it claims it is entitled to a reasonable

---

[78] Appellant's Brief at 26.

opportunity to recover all of its reasonable and necessary operating expenses.[79] However, it violates established fundamentals of rate-making when it attempts to recover these costs from ineligible, captive customers by charging them unjust and unreasonable rates.[80] Even the ALJ rejected this proposal as "contrary to the fundamental rate-making principle of cost causation and may harm the competitiveness of non-participating manufacturers." Entergy cannot demand adherence with traditional rate-making when it suits it and disregard it when it does not.

Entergy bases its argument that ineligible ratepayers should pay additional amounts on its interpretation of another part of the sentence in the statute. That sentence begins: "The tariffs subject to this subsection may not be considered to offer a discounted rate or rates under Section 36.007."[81] From the language "may not be considered," Entergy leaps to the conclusion that the Competitive Rates must be the *opposite* of discounted rates in Section

---

[79] Appellant's Brief at 13 and 27.

[80] PURA § 36.003.

[81] PURA § 39.452(b).

36.007. Section 36.007(a) requires that discounted rates must not be unreasonably preferential, prejudicial, discriminatory, predatory, or anticompetitive.[82] Entergy, therefore, interprets 39.452(b) as giving it free reign to charge preferential, prejudicial, discriminatory, and anticompetitive prices. This is absurd.

Further, because Section 36.007(d) states: "Notwithstanding any other provision of this title, the commission shall ensure that the electric utility's allocable costs of serving customers paying discounted rates under this section are not borne by the utility's other customers"[83]; Entergy assumes that any rates that are not discounted rates must ensure that costs *are* borne by the utility's other customers. That acrobatic leap is not necessary.

A more reasonable reading of the statement that the Competitive rates are not discounted rates is that they are not flat percentage rate discounts above the utility's marginal costs. The rates charged must cover the embedded costs of transmission and distribution and be based upon the same

---

[82] PURA § 36.007(a).

[83] PURA § 36.007(d).

cost of service as other customers. The Competitive Customers must negotiate their own bargain with the Competitive Suppliers and reap the benefit of the bargain they make—it does not entitle them to a discount.

Entergy's interpretation would violate actual statutory mandates. If Entergy is incorrect, and ineligible customers need not bear the additional rates the utility seeks, then it would defeat the purpose of creating competition to make the Competitive Customers pay Entergy what they were currently paying Entergy, and pay a Competitive Supplier too. If Entergy were correct that ineligible customers must pay for the revenue lost when an eligible customer opts for the Competitive Tariff, then Entergy's proposal violates that part of the statute that prohibits Entergy from harming the sustainability or competitiveness of manufacturers choosing not to take advantage of the Competitive program, and results in unjust and unreasonable rates for those customers.[84] Because not all manufacturers within Entergy's service area use the LIPS tariff to buy electricity, their sustainability and competitiveness would be diminished if they were forced

---

[84] PFD at 23-24 in Docket 37744; PURA § 39.452(b).

to pay additional lost-revenue rates when LIPS customers used the Competitive Tariff.[85]

The ALJ recognized that, contrary to Entergy's assertions, PURA § 39.452(b) does not mandate that unrecovered costs be recovered from non-participating customers.[86] The ALJ rejected Entergy's Competitive Program primarily because "it runs contrary to the fundamental rate-making principle of cost causation and may harm the competitiveness of nonparticipating manufacturers."[87] The Commission accepted a revised Competitive Program in Docket No. 38951, but properly rejected Entergy's cost-shifting approach.

Further, Entergy's reliance on the *High Plains* opinion is misplaced. *See R.R. Comm'n of Tex. v. High Plains Natural Gas Co.*, 628 S.W.2d 753 (Tex. Civ. App.—Austin 1981, writ ref'd n.r.e.) (per curiam). That case does not define the term "costs" in a statute nor explain how adding a new tariff may affect the amounts that a utility had expected to recover under an existing tariff.

---

[85] PFD at 24 in Docket 37744.

[86] *Id.*

[87] *Id.*

Nor, does *High Plains* stand for the proposition that rates must exactly collect the amount of expenses that a utility incurs. Such a requirement would run afoul of the Supreme Court's subsequent recognition that what determines a just and reasonable rate is far from a precise process. *Pub. Util. Comm'n of Tex. v. GTE-Sw., Inc.*, 901 S.W.2d 401, 411 (Tex. 1995). The Commission must utilize informed judgment and expertise using projections and estimates in virtually all areas of rate-making. *Id*.

Instead, *High Plains* addressed a particular component in a gas utility rate case, a purchased-gas-adjustment clause, as applied under the Gas Utility Regulatory Act ("GURA"). PURA § 36.201 prohibits such automatic adjustments and pass-through clauses. Thus, the analysis in *High Plains* of a type of rate that PURA prohibits has no bearing on this case.

Entergy's contorted application of traditional rate-making principles and misapplication of case law demonstrate that the Commission's statutory interpretation is the reasonable interpretation. Therefore, the Commission's order should be upheld.

**C.    Issue 2: Entergy should recover only implementation costs under the Competitive Rider, and they do not occur until the Competitive Program is implemented.**

   **1.    There are no implementation costs for Entergy to recover until the Competitive Program is implemented.**

The Commission properly included only implementation costs in the Competition Rider because that is all the plain language of the statute directs. The statute states that "rates shall be set … to recover any costs unrecovered as a result of the *implementation* of the tariff,"[88] and the Commission followed that directive. Entergy instead wants the Commission to include the costs of developing the tariff. But those are different.

Implementation occurs once the tariff has been created; development refers to the creation of the tariff. "Implementation" means "carry out, accomplish; *especially*: to give practical effect to and ensure of actual fulfillment by concrete measures" and it is synonymous with "administer."[89]

---

[88]   Tex. Util. Code § 39.452 (emphasis added).

[89]    *Implement Definition*, Merriam-Webster – Dictionary and Thesaurus, http://www.merriam-webster.com/dictionary/implement (last visited June 11, 2014). This Court noted that "implement" means to carry out in *CenterPoint Energy Houston Electric LLC*, 408 S.W.3d 910, 917 (Tex. App.—Austin 2013, pet. denied).

The competition tariff must be created before it can be administered. "Development," on the other hand, means "the act or process of creating something over a period of time."[90] The costs Entergy wanted to recover—all the costs it has incurred since November 10, 2010 when the Commission considered the PFD in Docket No. 37744 that related to the Competitive Tariff[91]—are costs of development or creation of the tariff, not costs of implementing the tariff.

Entergy will not recover implementation costs until the Competition Tariff is implemented. Therefore, the Commission "[did] not reach the issue of the amount to be recovered for the implementation and administration costs at this time because the amount cannot be known until [Entergy] actually implements the program."[92]

The Commission properly followed the plain language of the statute

---

[90] *Development Definition*, Merriam-Webster – Dictionary and Thesaurus, http://www.merriam-webster.com/dictionary/development (last visited June 11, 2014).

[91] Order at 8; Entergy's redlined tariff version Exhibit DRR-SD-6 at 1, Section II Purpose.

[92] Order at 11.

and its decision should be affirmed.

> **2.** **Entergy already recovered the costs to develop the Competitive Program as operating expenses in a previous rate case.**

> > **a.** **In Docket 39896 Entergy recovered costs to develop the Competitive Program as operating expenses.**

The expenses incurred prior to the tariff's implementation represent a regulated utility's cost of doing business. They are operating expenses. And Entergy's tariffs include operating expenses. Entergy claimed the program development costs as operating expenses in its rate case in Docket No. 39896. The tariff approved in that docket allowed Entergy to recover approximately $300,000 per year to cover those expenses.[93] Entergy should not be allowed to collect the development costs *again* under the Cost Rider.

---

[93]

*See* PFD in P.U.C. Docket No. 39896 at 229-231 http://interchange.puc.texas.gov/WebApp/Interchange/application/dbapps/filings/pgSearch_Results.asp?TXT_CNTR_NO=39896&TXT_ITEM_NO=764 (Stating that it is appropriate for the $310,746 in expenses associated with development of the Competitive Tariff to be charged to ratepayers as regulatory expenses.)**;** *see also* **Final** Order in P.U.C. Docket No. 39896 at 1 http://interchange.puc.texas.gov/WebApp/Interchange/application/dbapps/filings/pgSearch_Results.asp?TXT_CNTR_NO=39896&TXT_ITEM_NO=807 ("Except as discussed in this Order, the Commission adopts the proposal for decision, as corrected, including findings of fact and conclusions of law.");   AR, ETI Ex. 101, Dennis R. Roach Supp. Direct at 15.

**b.    It would violate the prohibition on retroactive rate-making to permit Entergy to offset the costs it has already collected from the Cost Rider.**

Although Entergy proposed to offset that amount against the implementation costs included in the Cost Rider, the Commission refused noting that would amount to retroactive rate-making. The rule against retroactive rate-making "prohibits a public utility commission from setting future rates to allow a utility to recoup past losses or to refund to consumers excess utility profits." *State v. Pub. Util. Comm'n of Tex.*, 883 S.W.2d 190, 199 (Tex. 1994). Thus, determining whether Entergy recovered all of its expenses for developing the competitive tariff would be prohibited retroactive rate-making.

**D.    Issue 3: Entergy is not entitled to collect interest on the balance of its unrecovered costs.**

The Commission properly rejected Entergy's request to recover interest on costs unrecovered as a result of implementing the tariff.[94] The interest Entergy requests is analogous to interest on rate-case expenses, which is not

---

[94] AR, Item 119, Order at 10.

allowed.[95]  It would be inappropriate for Entergy to recover interest on the unrecovered balance of its Cost Rider charges.[96]

### 1. Like rate-case expenses, the unrecovered implementation costs are relatively small and recovered quickly so that adding interest is not reasonable.

The implementation expenses should be treated like rate-case expenses because they can both be identified and recovered in a relatively short period of time.  Rate-case expenses are typically amortized over a three-year period without a return (interest) on the unamortized balance.[97]  Like rate-case expenses, Entergy's unrecovered implementation costs will be recouped relatively quickly making interest amounts *de minimus*.  Thus, unrecovered implementation costs are reasonably treated consistently with rate-case expenses.

---

[95]  *Id*.

[96]  *Id*. at 25, FoF 57C.

[97]  *Id*. at 10.

2. **The statutes do not require interest on unrecovered implementation costs.**

Entergy offers no authority that would permit it to recover interest on its unrecovered balance. Under PURA Chapter 36, the traditional cost-of-service rate-making paradigm permits a utility to recover its expenses, but it does not allow a utility to profit from those expenses. *Reliant Energy, Inc. v. Pub. Util. Comm'n of Tex.*, 153 S.W.3d 174, 183 (Tex. App.—Austin 2004, pet. denied); *Cities for Fair Util. Rates v. Pub. Util. Comm'n of Tex.*, 924 S.W.2d 933, 935 (Tex. 1996). It has long been the Commission's practice not to allow utilities to recover interest on rate-case expenses.[98]

Furthermore, the Competitive Program statute does not provide for carrying costs resulting from the implementation of the statute. PURA § 39.452(b) does not mention carrying costs or interest, consequently, the rules of statutory construction presume that the legislature did not intend to allow

---

[98] *Application of CenterPoint Energy Houston Electric, L.L.C. for a Competition Transition Charge*, Docket No. 30706, Order at 32 (July 14, 2005); *Application of Reliant Energy HL&P for Approval of Unbundled Cost of Service Rate Pursuant to PURA § 39.201 and Public Utility Commission Substantive Rule § 25.344*, Docket No. 22355, Order, FoF 98G (Oct. 4, 2001); *see Complaint of the City of McKinney Against Southwestern Bell Telephone Company*, Docket No. 11027, Final Order at CoL 9 (May 17, 1995).

interest for the unrecovered balance. *CenterPoint 2011,* 354 S.W.3d at 904.

The Commission's order permits Entergy to file an application for the implementation and administration of costs after the Competitive Program has been implemented for six months.[99] Entergy need not suffer a lengthy "regulatory lag"—the period of time between when the costs of implementing the Competitive Program are incurred and when they can be recovered. *Pub. Util. Comm'n of Tex. v. GTE-Sw., Inc.,* 901 S.W.2d 401, 405 (Tex. 1995). The time value of money that Entergy claims it must forgo is minimal at best. The statute does not contemplate this kind of expense.

### 3. The 2004 CenterPoint opinion does not mandate recovery of interest on all amounts in a rate case.

Entergy's reliance on *CenterPoint Energy, Inc. v. Public Utility Commission of Texas,* is misplaced. The case is inapplicable here because the only issue decided by the Supreme Court in that case was *when* interest on stranded costs could accrue after deregulation commenced, not if interest could accrue. 143 S.W.3d 81, 83 (Tex. 2004) ("The only issue before us is the date from which

---

[99] AR, Item 119, Order at 27, Ordering Paragraph 9.

carrying costs may be recovered once deregulation commenced…"). In that case, the Texas Supreme Court addressed the calculation of carrying costs on utilities' stranded costs in generation plants once retail competition was fully established. *Id*. Stranded costs were substantial amounts—in the billions of dollars—and recovered over a long period of time. Chapter 39 of PURA allowed the utilities to "fully recover their 'net, verifiable, nonmitigable stranded costs incurred in purchasing power and providing electric generation service." *Id*. at 84. Entergy's costs are not stranded costs of purchasing power and providing generation, but rather, ministerial tasks of drafting contracts and fine-tuning its billing system.

The Commission's decision to deny Entergy's request for interest on the unknown costs associated with the implementation and administration of the Competitive Program should be upheld.

## CONCLUSION AND PRAYER

The Commission correctly determined that the costs unrecovered as a result of the implementation of the Competitive Program tariff are the costs to implement and administer the Competitive Program tariff.

The evidence and testimony prove the "costs" that Entergy seeks to recover are actually "lost revenues." Legal precedent supports the exclusion of lost revenues unless specifically provided for by the legislature. Further, the evidence indicates that the design of the Competitive Program does not leave any costs unrecovered.

The Commission's statutory interpretation is reasonable and consistent with the statutory language. The Court should uphold the Commission's interpretation and reject Entergy's interpretation that would lead to inequitable treatment of the ineligible customers, and would prevent actual competition within the service area by allowing Entergy to continue to collect revenues for customers it does not serve. The Commission's interpretation also properly identifies that implementation costs cannot be recovered until the Competitive Tariff is implemented, and no collection of interest is permitted on the unrecovered balance.

The Commission prays that this Court uphold the Commission's reasonable interpretation of the statute based on the plain language, legal precedent, and evidence and testimony in the record.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

JON NIERMANN
Chief, Environmental Protection Division

ELIZABETH R. B. STERLING
Assistant Attorney General
State Bar No. 19171100
elizabeth.sterling@texasattorneygeneral.gov

*/s/ Megan Neal*
MEGAN NEAL
Assistant Attorney General
State Bar No. 24043797
megan.neal@texasattorneygeneral.gov

Office of the Attorney General
P.O. Box 12548, MC 066
Austin, Texas 78711-2548
512.463.2012
512.457.4610 (fax)

ATTORNEYS FOR THE PUBLIC UTILITY
COMMISSION OF TEXAS

# CERTIFICATE OF COMPLIANCE

I certify that the foregoing document has 9,322 words, calculated using computer program WordPerfect 12, pursuant to Texas Rules of Appellate Procedure Rule 9.4.

<u>/s/ *Megan Neal*</u>
Megan Neal

**CERTIFICATE OF SERVICE**

I hereby certify that on February 13, 2014, a true and correct copy of this document was electronically filed with the Court of Appeals for the Third District of Texas. All counsel were served electronically with a true and correct copy of this document through an electronic filing manager or by email to the following:

John F. Williams
Marnie A. McCormick
DUGGINS WREN MANN & ROMERO LLP
600 Congress Ave., Ste. 1900 (78701)
P. O. Box 1149
Austin, Texas 78767-1149
512.744.9300
512.744.9399 (fax)
jwilliams@dwmrlaw.com
mmccormick@dwmrlaw.com

ATTORNEYS FOR APPELLANT
ENTERGY TEXAS, INC.


/s/ Megan Neal
Megan Neal

# APPENDIX A

| | | |
|---|---|---|
| APPLICATION OF ENTERGY TEXAS, | § | PUBLIC UTILITY COMMISSION |
| INC. FOR APPROVAL OF | § | |
| COMPETITIVE GENERATION | § | OF TEXAS |
| SERVICE TARIFF (ISSUES SEVERED | § | |
| FROM DOCKET NO. 37744) | § | |

## INTERIM ORDER

### I.   Introduction

This interim order addresses the Commission's decision regarding three threshold issues surrounding Entergy Texas, Inc.'s (ETI's) proposed competitive generation service (CGS). The Commission makes its determination on these three threshold issues so the parties can move forward with the remaining issues that parties have characterized as being contingent on Commission decisions on the threshold issues:  (1) what types of costs that will be considered unrecovered for purposes of PURA § 39.452(b); (2) what types of ETI customers will be eligible for participation in the CGS program; and (3) which ETI customers will be responsible for paying the unrecovered costs.

ETI, Commission Staff, Office of Public Utility Counsel, Texas Industrial Energy Consumers, State Agencies, Kroger Co., Cities,[1] Wal-Mart Stores Texas, LLC and Sam's East, Inc. participated in this docket.

### II.   Procedural History

ETI submitted its proposed CGS tariff and related riders in Docket No. 37744, its last rate case.[2] In that rate case, the parties settled on all issues except for ETI's CGS proposal. After a hearing on the CGS proposal and the associated riders, the administrative law judge (ALJ)

---

[1] The cities of Anahuac, Beaumont, Bridge City, Cleveland, Conroe, Groves, Houston, Huntsville, Montgomery, Navasota, Nederland, Oak Ridge North, Orange, Pine Forest, Pinehurst, Port Arthur, Port Neches, Rose City, Shenandoah, Silsbee, Sour Lake, Splendora, Vidor, and West Orange.

[2] *Application of Entergy Texas, Inc. for Authority to Change Rates and Reconcile Fuel Costs,* Docket No. 37744, Corrected Application (Feb. 23, 2010).

137

forwarded the parties' stipulation and settlement agreement and the proposal for decision to the Commission for consideration.

The Commission considered the settlement and the proposal for decision at the November 10 and December 1, 2010 open meetings. The Commission adopted the settlement for the rate case issues and severed the CGS issues into this docket, including the record in Docket No. 37744.[3]

At the December 1, 2010 open meeting, the Commission requested the parties to enter into negotiations and work to come to agreement on as many of the undetermined CGS program issues as possible, and then bring the issues for which an agreement could not be reached back to the Commission for consideration. Status reports were filed on January 13 and 28, February 18, March 11, and April 8, 2011. These reports indicated that parties continued to negotiate and that they were working to narrow the contested issues.

On September 8, 2011, State Agencies, Cities, OPUC, Kroger, and Wal-Mart jointly filed a motion requesting a decision on the proposal for decision in this docket. TIEC and Commission Staff filed responses to the joint motion and generally opposed the motion. At the September 29, 2011 open meeting, the Commissioners considered the motions and issued an order requiring the parties to file pleadings identifying the CGS tariff issues that have been settled on by the parties and identifying the issues for which a settlement could not be reached. The parties were also permitted to identify issues that are contingent upon the Commission's determination of the unsettled issues.

On November 1, 2011, several parties[4] filed an agreed list of settled issues. However, the parties did not agree on a recommendation as to how the unsettled issues and issues that are contingent on the Commission's determination of unsettled issues should be addressed and resolved by the Commission. Therefore, TIEC also separately filed a list of unsettled issues and request for procedural schedule. TIEC also requested that the Commission receive additional evidence in order to resolve the unrecovered costs issue because ETI's proposal in Docket No. 37744 was based on ETI's proposal for an energy-only program, not an energy and

---

[3] *Application of Entergy Texas, Inc. for Authority to Change Rates and Reconcile Fuel Costs,* Docket No. 37744, Order No. 14 Memorializing Decision Granting Motion to Sever (Dec. 3, 2010).

[4] Cities, Entergy, OPUC, Commission Staff, State Agencies, and Wal-Mart/Sam's East. Kroger Company did not oppose the agreed settled issues and Cottonwood Energy has not participated in the discussions.

capacity-based program. TIEC reported that during the time period when the parties were negotiating the Entergy Operating Committee had agreed that CGS power from qualifying facilities in the ETI service territory could provide firm generation.[5]

At the December 8 and December 15, 2011 open meetings, the Commission decided that the parties should submit stipulated facts, the Commission would re-open the record to admit additional evidence, and then the Commission would make a decision on the unsettled issues. After that, the Commission planned to issue an interim order reflecting the decisions on the unsettled, threshold issues.

On January 20, 2012, the parties submitted agreed settlement terms and stipulated facts. The parties reached agreement in principle on a number of discrete items within the overall framework of the CGS program and tariffs. Many of the items are simply elements of larger program issues that retain one or more as yet unsettled aspects essential to final resolution of that program issue. Items as to which agreement in principle exists are "subject to satisfactory resolution of unsettled issues."[6]

On January 26, 2012, ETI submitted supplemental direct testimony. On February 10, 2012, the intervenors submitted supplemental direct testimony and on February 25, 2012, ETI and intervenors submitted rebuttal and cross rebuttal testimony. The parties submitted statements of position and pre-hearing briefs on March 26, 2012.

On April 13, 2012, the parties submitted an unopposed stipulation on the threshold issue regarding customers responsible for paying unrecovered costs. The parties, except ETI, agreed that CGS customers would be the only ETI customers responsible for unrecovered costs of the CGS program. ETI did not join or oppose this stipulation.[7] On April 18, 2012, the parties submitted a third stipulation on customer eligibility stating that LIPS customers would be the CGS-eligible customers, with certain limitations on the LIPS customers' participation and other program minimums and caps.[8]

---

[5] TIEC's Response to Joint Motion for Decision on Proposal for Decision at 4 (Sep. 15, 2011).

[6] CGS Stipulated Matters and Stipulated Facts (Jan. 20, 2012).

[7] Unopposed Stipulation on Unresolved Issue No. 3 (Apr. 13, 2012).

[8] Stipulation on Unresolved Issue No. 2 (Apr. 18, 2012).

000000003

The Commission held a hearing on the remaining contested threshold issue on April 19, 2012.

### III.    Discussion

PURA[9] § 39.452(b) requires ETI to propose a CGS tariff that would require ETI to purchase CGS, selected by the CGS customer, and provide the generation at retail to the customer.  ETI is required to provide and price retail transmission service, including necessary ancillary services, to retail customers who choose to take advantage of the competitive generation tariff at a rate that is unbundled from the utility's cost of service.  Competitive generation customers are not to be considered wholesale transmission customers.  The statute required the Commission to approve, reject, or modify the proposed tariff not later than September 1, 2010.  The CGS tariff may not be considered to offer a discounted rate or rates under Section 36.007, and ETI's rates shall be set, in the proceeding in which the tariff is adopted, to recover any costs unrecovered as a result of the implementation of the tariff.  The statute requires the Commission to ensure that a competitive generation tariff not be implemented in a manner that harms the sustainability or competitiveness of manufacturers that choose not to take advantage of competitive generation.  PURA § 39.452(b) also prohibits the Commission from issuing a decision relating to the competitive generation tariff that is contrary to an applicable decision, rule, or policy statement of a federal regulatory agency having jurisdiction.

The Commission finds that the three stipulation-and-settlement agreements are reasonable and adopts them to the extent they do not conflict with other Commission determinations in this docket.

Adoption of the three stipulation-and-settlement agreements leaves one threshold issue remaining:  the types of costs that will be considered ETI's unrecovered costs for purposes of PURA § 39.452(b).  The Commission finds that unrecovered costs are only those costs necessary to implement and administer the CGS program and are not to be defined to include lost revenues, embedded generation costs, or any other types of costs.

---

[9] Public Utility Regulatory Act (PURA), TEX. UTIL. CODE ANN. §§ 11.001-66.017 (Vernon 2007 & Supp. 2011).

## A. Eligible Customers Stipulation

The Commission adopts the stipulation and settlement regarding eligible customers and finds that LIPS customers are the ETI customers that will be eligible to participate in the CGS program (with further limitations as set forth in the parties' stipulation on this issue).[10]

## B. Customers Responsible for Paying Unrecovered Costs Stipulation

The Commission also adopts the stipulation and settlement regarding determining which customers will be responsible for paying the unrecovered costs referenced in PURA § 39.452(b). To the extent there are costs unrecovered as a result of implementation of the CGS program tariff, those costs will be borne solely by customers taking service under the CGS tariff.[11]

## C. January 20, 2012 CGS Stipulated Matters and Stipulated Facts

The Commission adopts the stipulated facts submitted by the parties on January 20, 2012 regarding ETI's capacity deficit and the program cap and notes that the items that are a part of the "agreed settlement terms" regarding eligible CGS suppliers, amount of CGS capacity, the CGS customer unbundled rate, the CGS energy payment, the CGS customer fixed-cost contribution, the CGS customer unserved energy rate, and the recognition of CGS supply as firm capacity are items for which there is only an agreement in principle that are subject to satisfactory resolution of unsettled issues.[12]

## D. Unrecovered Costs

The remaining threshold issue, the meaning of "costs unrecovered as a result of implementation of the CGS program tariff," as used in PURA § 39.452(b), was the subject of the April 19, 2012 hearing. In the proposal for decision, the ALJ found that ETI is entitled to collect unrecovered embedded generation costs and any other related base rate costs as a result of customer migration to the CGS program.[13]

---

[10] Stipulation on Unresolved Issue No. 2 (Apr. 18, 2012).

[11] Unopposed Stipulation on Unresolved Issue No. 3 (Apr. 13, 2012).

[12] CGS Stipulated Matters and Stipulated Facts at 1 (Jan. 20, 2012).

[13] Proposal for Decision at 22 (Oct. 5, 2010).

ETI argued that unrecovered costs should be defined as the embedded production costs and any other related base rate costs that would have been recovered through traditional rates charged to CGS customers that will no longer be recovered due to the CGS program.[14] TIEC took the position that unrecovered costs should not include ETI's hypothetical lost revenues and that the costs that could be unrecovered as a result of implementation of the tariff should include the expenditures actually incurred by ETI to implement and maintain the CGS program.[15] Cities and OPUC agreed with TIEC that unrecovered costs are not the same thing as unrecovered revenues.[16] Cities also noted that it would be unreasonable to allow ETI to continue to incur costs for a customer the utility no longer plans to serve.[17]

In making its determination of the definition of unrecovered costs, the Commission follows the precedent set in *CenterPoint Energy Houston Electric, LLC v. Pub. Util. Comm'n*, 354 S.W.3d 899 (Tex. App—Austin, 2011 no pet.) where the Third Court of Appeals found that because the language of PURA § 39.905 did not specifically provide for recovery of "lost revenues" and that in at least two other provisions of PURA[18] the legislature expressly distinguishes "costs" from "revenues," the term "costs," as used by the legislature in PURA § 39.905, is not intended to include lost revenues.[19] Like PURA § 39.905, PURA § 39.452(b) only provides for "costs unrecovered as a result of implementation of the tariff" and does not specifically provide for the utility to recover lost revenues or any other type of costs.

Based on the evidence and testimony, the Commission finds that the proper interpretation of "costs unrecovered as a result of implementation of the CGS program tariff" is costs to implement and administer the CGS program tariff. Such unrecovered costs do not include lost revenues, embedded generation costs, or any other types of costs. The Commission reverses the proposal for decision on this issue.

---

[14] Supplemental Direct Testimony, Exhibits, and Workpapers of Phillip R. May, ETI Ex. 91 at 6.

[15] Supplemental Direct Testimony of Jeffry Pollock, TIEC Ex. 15 at 14-15.

[16] Supplemental Direct Testimony of Karl Nalepa, Cities Ex. 6C at 7 and Supplemental Cross Rebuttal Testimony of Clarence Johnson, OPUC Ex. 8 at 6.

[17] Supplemental Direct Testimony of Karl Nalepa, Cities Ex. 6C at 7-8.

[18] PURA § 55.024(b) and PURA § 56.025(e).

[19] *CenterPoint Energy Houston Electric, LLC v. Pub. Util. Comm'n*, 354 S.W.3d 899, 903-904 (Tex.Civ.App—Austin, 2011)

The Commission issues this interim order so that the parties may work to reach an agreement on the components of the CGS program tariff that are contingent on the Commission's decision on the threshold issues.

## IV.    Conclusion

The Commission adopts each of the three stipulation-and-settlement agreements and finds that unrecovered costs for the CGS program are those needed to implement and administer the CGS program and are not lost revenues, embedded generation costs, or any other types of costs.

## V.    Findings of Fact

### *Procedural History*

1. As part of its application in Docket No. 37744, *Application of Entergy Texas, Inc. for Authority to Change Rates and Reconcile Fuel Costs*, ETI proposed a competitive generation service (CGS) program pursuant to Public Utility Regulatory Act. Tex. Util. Code Ann. (PURA) § 39.452(b).

2. On July 16, 2010 and July 20, 2010, a State Office of Administrative Hearings administrative law judge held a hearing on the merits on ETI's CGS proposal.

3. A proposal for decision was issued on November 1, 2010. The ALJ ultimately recommended that the CGS proposal be rejected.

4. The Commission considered the proposal for decision at the November 10 and December 1, 2010 open meetings as part of Docket No. 37744. At the December 1, 2010 open meeting, the Commission adopted the settlement for the rate case issues and severed the CGS proposal into this Docket. The Commission requested that the parties enter into negotiations and work to come to agreement on as many of the undetermined issues as possible, and then bring the issues for which an agreement could not be reached back to the Commission for consideration.

5. Order No. 1 was issued on December 3, 2010 severing the CGS issues into this docket, including the record in Docket No. 37744.

6.    Sabine Cogen, LP filed a motion to intervene in this docket on December 23, 2010. ETI filed an objection to Sabine Cogen, LP's motion to intervene on December 30, 2010. Sabine Cogen, LP's motion to intervene was denied in Order No. 3 on January 12, 2011.

7.    ETI, Commission Staff, Office of Public Utility Counsel, Texas Industrial Energy Consumers, State Agencies, Kroger Co., Cities,[20] Wal-Mart Stores Texas, LLC and Sam's East, Inc., and Cottonwood Energy are parties to this proceeding.

8.    On January 11, 2011, the Commission ALJ issued Order No. 2 requiring ETI to either provide an update on the status of settlement discussions or to propose a schedule, agreed to by all parties, for finalizing the outstanding issues.

9.    The parties filed status reports on January 13 and 28, February 18, March 11, and April 8, 2011. These reports indicated that parties continued to negotiate and that they thought that they could narrow the issues.

10.   On September 8, 2011, State Agencies, Cities, OPUC, Kroger, and Wal-Mart jointly filed a motion requesting a decision on the proposal for decision in this docket. TIEC and Commission Staff filed responses to the joint motion and generally opposed the motion. At the September 29, 2011 open meeting, the Commissioners considered the motions and issued an order requiring the parties to file pleadings identifying the CGS tariff issues that have been settled on by the parties and identifying the issues for which a settlement could not be reached. The parties were also permitted to identify issues that are contingent upon the Commission's determination of the unsettled issues.

11.   On November 1, several parties filed an agreed list of settled issues. TIEC also separately filed a list of unsettled issues and request for procedural schedule. TIEC also requested that the Commission receive additional evidence in order to resolve the unrecovered costs issues because ETI's proposal in Docket No. 37744 was based on ETI's proposal for an energy-only program, not an energy and capacity-based program. The circumstances had changed primarily due to the agreement of the Entergy Operating to treat CGS power from qualifying facilities in the ETI service territory as firm

---

[20] The cities of Anahuac, Beaumont, Bridge City, Cleveland, Conroe, Groves, Houston, Huntsville, Montgomery, Navasota, Nederland, Oak Ridge North, Orange, Pine Forest, Pinehurst, Port Arthur, Port Neches, Rose City, Shenandoah, Silsbee, Sour Lake, Splendora, Vidor, and West Orange.

000000008

generation. The remainder of the parties filed a joint agreed list of unsettled issues and issues contingent on a Commission determination of unsettled issues.

12. At the December 8 and December 15, 2011 open meetings, the Commissioners decided that the parties should submit stipulated facts, the Commission would re-open the record to admit additional evidence as requested by TIEC, and then the Commission would make a decision on the three threshold unsettled issues in an interim order.

13. On December 18, 2011, Order No. 4 was issued establishing a procedural schedule.

14. On January 20, 2012, the parties submitted agreed settlement terms and stipulated facts. The parties reached agreement in principle on a number of discrete items within the overall framework of the CGS program and tariffs. Many of the items are simply elements of larger program issues that retain one or more as yet unsettled aspects essential to final resolution of that program issue. Items as to which agreement in principle exists are "subject to satisfactory resolution of unsettled issues."

15. On January 24, 2012, Order No. 5 was issued clarifying the number of copies of testimony that were to be filed by the parties.

16. On January 26, 2012, ETI submitted supplemental direct testimony. On February 10, 2012, the intervenors submitted supplemental direct testimony and on February 25, 2012, ETI and intervenors submitted rebuttal and cross rebuttal testimony. The parties submitted statements of position and pre-hearing briefs on March 26, 2012.

17. Order No. 6 was issued on February 1, 2012 setting April 19, 2012 as the date for the hearing.

18. On April 13, 2012, the parties filed an unopposed stipulation that to the extent there are costs unrecovered as a result of the implementation of a CGS tariff, those costs should be borne solely by customers taking service under the CGS tariff. ETI did not join but did not oppose the stipulation.

19. On April 18, 2012, the parties filed an unopposed stipulation regarding customer eligibility. LIPS customers will be eligible to participate in ETI's CGS program (with further limitations as set forth in the stipulation on this issue).

20. The Commission held the hearing on the merits on April 19, 2012.

*Eligible customers stipulation*

21.    The parties agreed that only customers eligible to take service under ETI's Large Industrial Power Service (LIPS) are eligible customers for the CGS program.

22.    The parties agreed that only LIPS firm load will be eligible to participate in the CGS program.

23.    The parties agreed that LIPS customers with interruptible service (IS) or standby and maintenance service (SMS) load are not precluded from participating in the CGS program, but this participation is limited to their firm LIPS load. To the extent that customers with IS load participate in the CGS program, they must comply with the terms of the IS tariffs regarding minimum LIPS load. Only the portion of the customer's LIPS load that is in excess of the firm contract power minimum requirement under section 1 of Schedule IS is eligible for the CGS program.

24.    The parties agreed that to the extent there are increased administration costs associated with billing a customer that has CGS and IS or SMS load, the CGS customer will bear the costs.

25.    The parties agreed that there will be a 115 MW cap on the CGS program.

26.    The parties agreed that there will be a 5 MW minimum on CGS customer load.

27.    The parties agreed that there will be no aggregation of CGS customer load to meet the 5 MW minimum on CGS customer load.

28.    The parties agreed that there will be a cap of 10 CGS purchase agreements.

*Customers responsible for paying unrecovered costs stipulation*

29.    The parties, except ETI, agreed that to the extent there are costs unrecovered as a result of the implementation of a CGS tariff, those costs should be borne solely by customers taking service under the CGS tariff, *i.e.*, CGS customers. ETI did not oppose this stipulation.

*January 20, 2012 CGS Stipulated Matters and Stipulated Facts*

30.    In the CGS stipulated matters and stipulated facts filed on January 20, 2012, the parties stated they had reached an agreement in principle on a number of discrete items within

the overall framework of the CGS program and tariffs, which were listed in Section I. A-G of the stipulation. However, many of those items are simply elements of larger program issues that retain one or more as yet unsettled aspects essential to final resolution of that program issue. Items as to which agreement in principle exists, subject to satisfactory resolution of unsettled issues, include the following:

A.      Eligible CGS suppliers

1.      Eligible CGS suppliers will be limited to qualifying facilities that are or will be directly connected to ETI. Any expansion of eligible CGS suppliers would require initiation of new Commission proceedings.

B.      Amount of CGS capacity

1.      A CGS customer will specify the amount of its load to be served by a specified CGS supplier.

2.      The specified CGS supplier will enter into a contract with Entergy Services, Inc., on behalf of ETI, or directly with ETI, for the purpose of becoming an Entergy system network resource. The agreement between the CGS supplier and Entergy Services, Inc. or ETI shall include a contract for the purchase of capacity and energy (CGS purchase agreement). Per determination of the Entergy Operating Committee, the capacity and energy contracted for under the CGS purchase agreements shall be allocated solely to ETI.

3.      The level of capacity contracted for under the CGS purchase agreement (CGS contract capacity) will be the same level of capacity contracted for in a separate but related contract between the CGS supplier and the CGS customer.

4.      The monthly CGS supplied capacity shall be calculated monthly based on the on-peak energy deliveries of CGS-supplied energy from the CGS supplier. The monthly CGS supplied capacity shall be the lesser of the CGS contract capacity and the result of the following calculation—on a rolling 12-month basis (using a cumulative basis during the first 11 months), the sum of the CGS-supplied energy delivered by the CGS supplier during on-peak hours, divided by the number of on-peak hours during the same time period, divided by 0.8. On-peak hours are defined as the hours ending 7:00 am

through 10:00 pm Monday through Saturday, excluding North American Electric Reliability Corporation holidays.

C.      CGS-customer unbundled rate

1.      CGS customers are limited to, and will remain, ETI retail customers.

2.      ETI will not make a capacity payment to the CGS supplier, and the CGS customer will not pay ETI the embedded production cost in the firm rate schedule under which the customer would otherwise be eligible to receive service.

3.      The price for retail delivery service, including necessary ancillary services, to retail customers who choose to take advantage of the competitive generation tariff will be a rate that is unbundled from ETI's cost of service and that will be determined by a credit to the CGS customer's bill based on the unbundled production costs associated with the otherwise applicable firm rate.

4.      The unbundled, embedded production cost for a LIPS customer based on current rates is $6.84 per kW per month. The CGS credit is subject to review and modification in subsequent rate cases. If the clause "less any corresponding concurrent reduction in energy purchased by the CGS customer" referenced in section F.1 below is adopted, then certain parties may recommend a further adjustment to the LIPS embedded production cost specified in this paragraph C.4.

5.      With the exception of the capacity credit and fixed fuel factor, a CGS customer will pay ETI a retail rate that includes all other charges the customer would pay as a firm customer (for example Rider TTC, HRC, SRC, SRO, and IFF charges, if applicable).

D.      CGS energy payment

1.      CGS customers will pay fuel costs based on avoided cost for CGS-supplied energy. Specifically, ETI will purchase hourly CGS energy supplied by the CGS supplier from the CGS contract capacity at the system hourly avoided-energy-cost as determined under Rate Schedule LQF. ETI will charge the CGS customer at the same rate for that hourly CGS-supplied energy not to exceed the energy requirement of the CGS customer.

E.    CGS customer fixed-cost contribution

1.    The level of compensation to ETI from CGS customers for CGS service will include a monthly fixed charge called a fixed-cost contribution.

2.    The fixed-cost contribution will be $1.10 per kW of CGS load per month.

3.    Revenues from the fixed-cost contribution will reduce any otherwise unrecovered costs associated with the program.

F.    CGS customer unserved energy rate

1.    If, in any hour in a delivery month, there is hourly CGS unserved energy, the CGS customer will take service from ETI under the CGS unserved energy rate. Hourly CGS unserved energy is the difference in any given hour between the amount of energy corresponding to the full amount of CGS contract capacity and the amount of energy actually supplied to ETI from the CGS contract capacity by the CGS supplier in such hour, not to exceed the energy requirement of the CGS customer. The parties have not agreed whether the following clause should be added to this last sentence: "less any corresponding concurrent reduction in energy purchased by the CGS customer."

2.    The structure of the CGS unserved energy tariffed rate will include an agreed energy charge and agreed O&M adder. The monthly CGS unserved energy charge will be the sum of (a) the hourly CGS unserved energy for the month times 105% of the system hourly avoided energy cost as determined under Rate Schedule LQF and (b) the hourly CGS unserved energy for the month times specified variable O&M charges specified immediately below in paragraph 3.

3.    The specified variable O&M charges for the CGS unserved energy rate are as follows:

| Delivery Voltage | On-Peak Per kWh | Off-Peak Per kWh |
|---|---|---|
| Distribution (less than 69kV) | $0.03555 | 0.00540 |
| Transmission (69kV and greater) | $0.02451 | 0.00222 |

000000013

4.　　On-peak and off-peak hours for the CGS unserved energy rate are as follows:

a.　　Summer: On-peak hours are 1:00 pm to 9:00 pm Monday through Friday of each week beginning on May 15 and continuing through October 15 of each year except that Memorial Day, Labor Day and Independence Day (July 4 or the nearest weekday if July 4 is on a weekend) are not on-peak.

b.　　Winter: On-peak hours for each week of Monday through Friday beginning October 16 and continuing through May 14 of each year are 6:00 am to 10:00 am and 6:00 pm to 10:00 pm, except that Thanksgiving Day, Christmas Day, and New Year's Day (or the nearest weekday if the holiday should fall on a weekend) are not on-peak.

c.　　Off-peak hours are all hours of the year not specified as on-peak hours. With the approval of the Commission, ETI may at its sole discretion change on-peak hours and season from time to time.

5.　　Revenues from the CGS unserved energy rate derived from the variable O&M charges will go towards offsetting any unrecovered costs as a result of the implementation of the CGS tariff.

6.　　Revenues from the CGS unserved energy rate derived from 105% of the system hourly avoided energy charges will go towards offsetting ETI's eligible fuel costs.

G.　　Recognition of CGS supply as firm capacity. Progress has been made on resolving issues regarding the recognition of CGS capacity as firm capacity, but final resolution of these issues, including the following, is contingent on the Entergy Operating Committee's approval as well as a final resolution of all issues.

1.　　The Entergy Operating Committee has established certain conditions that must be met before it will recognize a CGS purchase agreement as "capability" for the Entergy System, for purposes of determining reserve equalization payments or receipts. The parties are continuing to discuss the conditions established by the Operating Committee.

000000014

2.      The capacity product from CGS purchase agreements will be a 24/7 unit-contingent product.

3.      The delivery term of CGS purchase agreements may be from one year to five years, and must be a whole number of years.

4.      The contract capacity will be a fixed capacity amount throughout any successive 12-month period during the contract term.

5.      The parties have tentatively agreed to a number of concepts for firming up CGS capacity that would be reflected in a form contract for use in implementing the CGS program. The parties will continue to negotiate other concepts and terms for inclusion in a form supply contract.

31.      The parties stipulated that the Strategic Resource Plan (SRP) for the Entergy system (of which ETI is a part) projects a continuing need for additional capacity for ETI and the Entergy system through 2017. Entergy's and ETI's resource needs are subject to change at any time based on actual experience related to operational conditions, resource offers and solicitations, and other events that affect resource needs.

32.      The parties stipulated that based on an assessment of load requirements and generating capability, the SRP projects that ETI has an incremental net resource deficiency of 260 MW in 2012 and 504 MW in 2013.

33.      The parties stipulated that the Entergy system-wide planning process is conducted pursuant to the requirements of the Entergy system agreement and is designed to result in a portfolio of resources that differ by term and source. The Entergy system agreement states that the objective of this process is to ensure cost-effective, reliable levels of service.

34.      The parties stipulated that CGS purchase agreements are resources that will be included in the Entergy System's portfolio of supply resources, consistent with the terms and conditions related to the delivery requirements of those purchase agreements (*e.g.*, degree of dispatchability, term, degree of firmness).

35.      The parties stipulated that it is reasonable at the outset of the CGS program to establish a cap on the amount of load that may subscribe to CGS service.

36.     The parties stipulated that the range of the cap should be between 80 MW and 150 MW.

*Unrecovered costs*

37.     It is reasonable to adopt the three unopposed stipulation-and-settlement agreements regarding customer eligibility for the CGS program; the customers responsible for paying for unrecovered costs; the capacity deficit; and the program cap.

38.     PURA § 39.452(b) provides for the utility to be able to recover any costs unrecovered as a result of the implementation of the tariff.

39.     In *CenterPoint*, the Third Court of Appeals found that because the language of PURA § 39.905 did not specifically provide for recovery of "lost revenues" and that in at least two other provisions of PURA the legislature expressly distinguishes "costs" from "revenues," the term "costs," as used by the legislature in PURA § 39.905, is not intended to include lost revenues. Like PURA § 39.905, PURA § 39.452(b) only provides for "costs unrecovered as a result of implementation of the tariff" and does not specifically provide for the utility to recover lost revenues or any other type of costs.

40.     The Commission finds that the costs that will be unrecovered as a result of the implementation of the CGS program tariff are the costs to implement and administer the CGS program tariff.

## VI.     Conclusions of Law

1.      The Commission has jurisdiction and authority over this proceeding pursuant to PURA §§ 14.001 and 39.452(b).

2.      PURA § 39.452(b) does not allow for the recovery of lost revenue or embedded generation costs.

## VII.     Ordering Paragraphs

1.      The Commission adopts each of the three stipulation-and-settlement agreements filed on January 20, 2012, April 30, 2012, and April 18, 2012.

2.      The parties shall work to reach an agreement on the issues that are considered contingent on the Commission's decision on the threshold issues.

3.      All other motions, requests for entry of specific findings of fact and conclusions of law, and any other requests for general or specific relief, if not expressly granted, are denied.

SIGNED AT AUSTIN, TEXAS the _12th June_ day of ~~May~~ 2012

PUBLIC UTILITY COMMISSION OF TEXAS

DONNA L. NELSON, CHAIRMAN

KENNETH W. ANDERSON, JR., COMMISSIONER

ROLANDO PABLOS, COMMISSIONER

q:\cadm\orders\interim\38000\38951 interim order.docx

# APPENDIX B



| | | |
|---|---|---|
| APPLICATION OF ENTERGY TEXAS, | § | PUBLIC UTILITY COMMISSION |
| INC. FOR APPROVAL OF | § | |
| COMPETITIVE GENERATION | § | OF TEXAS |
| SERVICE TARIFF (ISSUES SEVERED | § | |
| FROM DOCKET NO. 37744) | § | |

## ORDER

### I.    Introduction

This order addresses Entergy Texas, Inc.'s (ETI's) application for a competitive generation service (CGS) under PURA § 39.452(b). The Commission approves ETI's CGS rider and competitive generation service cost (CGSC) rider as set out in this order.

This order incorporates the Commission's interim order issued in this docket on June 12, 2012 and the Commission's rulings adopting in part and rejecting in part the stipulation and settlement agreement filed by ETI, Texas Industrial Energy Consumers (TIEC), and Commission Staff on May 17, 2013. The interim order addressed the Commission's decision regarding three threshold issues surrounding ETI's CGS program. The May 17 settlement, as adopted in part and rejected in part, resolves all other contested issues in this docket.

### II. Procedural History

ETI submitted its proposed CGS tariff and related riders in Docket No. 37744, its last rate case.[1] In that rate case, the parties settled on all issues except for ETI's CGS proposal. After a hearing on the CGS proposal and the associated riders, the administrative law judge (ALJ) forwarded the parties' stipulation and settlement agreement and the proposal for decision to the Commission for consideration.

---

[1] *Application of Entergy Texas, Inc. for Authority to Change Rates and Reconcile Fuel Costs,* Docket No. 37744, Corrected Application (Feb. 23, 2010).

209

The Commission considered the settlement and the proposal for decision at the November 10 and December 1, 2010 open meetings. The Commission adopted the settlement for the rate case issues and severed the CGS issues into this docket, including the record in Docket No. 37744.[2]

At the December 1, 2010 open meeting, the Commission requested the parties to enter into negotiations and work to come to agreement on as many of the undetermined CGS program issues as possible, and then bring the issues for which an agreement could not be reached back to the Commission for consideration. Status reports were filed on January 13 and 28, February 18, March 11, and April 8, 2011. These reports indicated that parties continued to negotiate and that they were working to narrow the contested issues.

On September 8, 2011, State Agencies, Cities, OPUC, Kroger, and Wal-Mart jointly filed a motion requesting a decision on the proposal for decision in this docket. TIEC and Commission Staff filed responses to the joint motion and generally opposed the motion. At its September 29, 2011 open meeting, the Commissioners considered the motions and issued an order requiring the parties to file pleadings identifying the CGS tariff issues that have been settled on by the parties and identifying the issues for which a settlement could not be reached. The parties were also permitted to identify issues that are contingent upon the Commission's determination of the unsettled issues.

On November 1, 2011, several parties[3] filed an agreed list of settled issues. However, the parties did not agree on a recommendation as to how the unsettled issues and issues that are contingent on the Commission's determination of unsettled issues should be addressed and resolved by the Commission. Therefore, TIEC also separately filed a list of unsettled issues and request for procedural schedule. TIEC also requested that the Commission receive additional evidence in order to resolve the unrecovered costs issue because ETI's proposal in Docket No. 37744 was based on ETI's proposal for an energy-only program, not an energy and capacity-based program. TIEC reported that during the time period when the parties were

---

[2] *Application of Entergy Texas, Inc. for Authority to Change Rates and Reconcile Fuel Costs*, Docket No. 37744, Order No. 14 Memorializing Decision Granting Motion to Sever (Dec. 3, 2010).

[3] Cities, Entergy, OPUC, Commission Staff, State Agencies, and Wal-Mart/Sam's East. Kroger Company did not oppose the agreed settled issues and Cottonwood Energy has not participated in the discussions.

negotiating, the Entergy Operating Committee had agreed that CGS power from qualifying facilities in the ETI service territory could provide firm generation.[4]

At the December 8 and December 15, 2011 open meetings, the Commission decided that the parties should submit stipulated facts, the Commission would re-open the record to admit additional evidence, and then the Commission would make a decision on the unsettled issues. After that, the Commission planned to issue an interim order reflecting the decisions on the unsettled, threshold issues.

On January 20, 2012, the parties submitted agreed settlement terms and stipulated facts. The parties reached agreement in principle on a number of discrete items within the overall framework of the CGS program and tariffs. Many of the items were simply elements of larger program issues that retained, at that time, one or more unsettled aspects essential to final resolution of that program issue. Items as to which there was agreement in principle were "subject to satisfactory resolution of unsettled issues."[5]

On January 26, 2012, ETI submitted supplemental direct testimony. On February 10, 2012, the intervenors submitted supplemental direct testimony and on February 25, 2012, ETI and intervenors submitted rebuttal and cross rebuttal testimony. The parties submitted statements of position and pre-hearing briefs on March 26, 2012.

On April 13, 2012, the parties submitted an unopposed stipulation on the threshold issue regarding customers responsible for paying unrecovered costs. The parties, except ETI, agreed that CGS customers would be the only ETI customers responsible for unrecovered costs of the CGS program. ETI did not join or oppose this stipulation.[6] On April 18, 2012, the parties submitted a third stipulation on customer eligibility stating that large industrial power service (LIPS) customers would be the CGS-eligible customers, with certain limitations on the LIPS customers' participation and other program minimums and caps.[7]

The Commission held a hearing on the remaining contested threshold issue—what types of costs will be considered unrecovered for purposes of PURA § 39.452(b)—on April 19, 2012.

---

[4] TIEC's Response to Joint Motion for Decision on Proposal for Decision at 4 (Sep. 15, 2011).

[5] CGS Stipulated Matters and Stipulated Facts (Jan. 20, 2012).

[6] Unopposed Stipulation on Unresolved Issue No. 3 (Apr. 13, 2012).

[7] Stipulation on Unresolved Issue No. 2 (Apr. 18, 2012).

An interim order was issued on June 12, 2012. It was expected that the parties would reach agreement on the remaining issues.

On November 27, 2012, TIEC filed a motion to adopt a CGS program and submitted proposed CGS riders for approval. TIEC and ETI had not been able to resolve certain issues related to the CGS tariffs and TIEC stated that continued negotiations would only result in further delay of the implementation of the CGS program.[8] Commission Staff requested that the parties be required to submit a procedural schedule to govern the handling of the docket.[9] ETI submitted its own version of the CGS tariffs for approval and proposed procedures to lead to final disposition of this docket.[10]

The Commission ALJ issued Order No. 10 adopting a procedural schedule that required the parties to indicate by February 8, 2013 whether a hearing was necessary. TIEC filed a letter stating that no party intended to file a request for a live hearing to cross-examine witnesses on the remaining contested issues.[11] Cities, OPUC, ETI, TIEC, and Commission Staff filed briefs on March 1, 2013 and reply briefs on March 20, 2013. At the April 25, 2013 open meeting, the parties gave oral argument and the Commissioners discussed the Entergy Operating Committee review of the capacity component of the CGS program and the proposed MISO regulatory change provision. The Commission deferred its ultimate decision on all of the issues to the May 9, 2013 open meeting.

On May 8, 2013, TIEC filed a letter stating that TIEC and ETI had reached a preliminary agreement on the remaining disputed issues, but that the other parties had not had an opportunity to review the agreement.[12] At the May 9 open meeting, the Commission deferred consideration of the docket until the May 23, 2013 open meeting.

ETI filed a stipulation and settlement agreement on May 17, 2013 that addressed each of the disputed issues that remained in this case. ETI, TIEC, and Commission Staff signed the

---

[8] TIEC's Motion to Adopt a Competitive Generation Services Program (Nov. 27, 2012).

[9] Commission Staff's Response to TIEC's Motion to Adopt a Competitive Generation Services Program (Dec 4, 2012).

[10] Entergy's Response to TIEC's Motion to Adopt Competitive Generation Services Program and Motion for Adoption of Competitive Generation Services Tariffs at 1-2 (Dec. 4, 2012).

[11] Letter from TIEC (Feb. 8, 2013).

[12] Letter from TIEC (May 8, 2013).

stipulation. The stipulation and settlement agreement included agreement on all of the issues regarding the CGS rider, *i.e.*, how the CGS program would work, but delayed approval of the competitive generation service cost (CGSC) rider, which is the rider that will include implementation and administration costs for the CGS program, for a later date.

Specifically, the signatories to the settlement agreed that the CGSC rider would not be proposed for approval, but would be filed with the Commission no earlier than six months after the CGS rider becomes effective. The parties also stipulated to five issues that would be addressed in the CGSC rider docket. ETI noted that Commission Staff supports the stipulation, but did not take a position relating to the deferral of the consideration of issues regarding the CGSC rider.[13] OPUC, joined by Kroger Company, Wal-Mart Stores, LLC, and Sam's East, Inc. filed a statement of opposition to the stipulation stating that their opposition was limited to Section II.B. of the stipulation, which allows the delay of the resolution of the CGSC rider issues.[14] Cities filed a letter on May 21 stating that it supports the resolution of the issues in the stipulation, but that they also support resolving all issues at this time in order to conserve judicial resources and provide certainty to parties in future cases.[15] TIEC filed a response to the opposition[16] and OPUC, Kroger, Wal-Mart, and Sam's East filed a reply to TIEC's response.[17]

The Commission considered this docket again on the merits at the May 23, 2013 open meeting. The Commission adopts the May 17, 2013 stipulation and settlement agreement in part, but rejects the deferral of approval of the CGSC rider set out in section II.B.2. of the stipulation. The Commission adopts the stipulation and settlement agreement as it pertains to the CGS rider, and makes findings on the outstanding issues related to the CGSC rider.

---

[13] Stipulation and Settlement Agreement (May 17, 2013).

[14] Joint Statement of Position (May 17, 2013).

[15] Cities' Letter Addressing the Settlement Reached by Entergy and TIEC (May 21, 2013).

[16] TIEC's Response to OPUC's Statement of Opposition (May 21, 2013).

[17] Joint Reply to TIEC's Response to the Joint Statement of Opposition (May 22, 2013).

## III.    Discussion

PURA[18] § 39.452(b) requires ETI to propose a CGS tariff that would require ETI to purchase CGS, selected by the CGS customer, and provide the generation at retail to the customer. ETI is required to provide and price retail transmission service, including necessary ancillary services, to retail customers who choose to take advantage of the competitive generation tariff at a rate that is unbundled from the utility's cost of service. Competitive generation customers are not to be considered wholesale transmission customers. The statute required the Commission to approve, reject, or modify the proposed tariff not later than September 1, 2010. The CGS tariff may not be considered to offer a discounted rate or rates under Section 36.007, and ETI's rates shall be set, in the proceeding in which the tariff is adopted, to recover any costs unrecovered as a result of the implementation of the tariff. The statute requires the Commission to ensure that a competitive generation tariff not be implemented in a manner that harms the sustainability or competitiveness of manufacturers that choose not to take advantage of competitive generation. PURA § 39.452(b) also prohibits the Commission from issuing a decision relating to the competitive generation tariff that is contrary to an applicable decision, rule, or policy statement of a federal regulatory agency having jurisdiction.

The Commission finds that the three stipulation and settlement agreements submitted by the parties in January and April 2012 are reasonable and adopts them to the extent they do not conflict with other Commission determinations in this docket.

The Commission also finds that unrecovered costs are only those costs necessary to implement and administer the CGS program and are not to be defined to include lost revenues, embedded generation costs, or any other types of costs.

Finally, the Commission finds that the May 17, 2013 stipulation with regard to the CGS rider is reasonable and adopts that portion of the stipulation. The Commission declines to adopt the stipulation regarding the CGSC rider, and finds that the issues regarding the CGSC rider should not be deferred and that the CGSC rider should not include costs prior to implementation of the CGS program; LIPS and LIPS time-of-day customers should be responsible for the CGSC

---

[18] Public Utility Regulatory Act (PURA), TEX. UTIL. CODE ANN. §§ 11.001-66.017 (Vernon 2007 & Supp. 2011).

rider costs if the CGS program is unsubscribed; ETI should not recover interest on any unrecovered balance of the CGSC rider; and the CGSC rider costs should not be offset to account for the CGS costs included in ETI's base rates.

## A. Unrecovered Costs

As explained in the interim order, the meaning of "costs unrecovered as a result of implementation of the CGS program tariff," as used in PURA § 39.452(b), was the subject of the April 19, 2012 hearing. In the proposal for decision, the ALJ found that ETI is entitled to collect unrecovered embedded generation costs and any other related base rate costs as a result of customer migration to the CGS program.[19]

ETI argued that unrecovered costs should be defined as the embedded production costs and any other related base rate costs that would have been recovered through traditional rates charged to CGS customers that will no longer be recovered due to the CGS program.[20] TIEC took the position that unrecovered costs should not include ETI's hypothetical lost revenues and that the costs that could be unrecovered as a result of implementation of the tariff should include the expenditures actually incurred by ETI to implement and maintain the CGS program.[21] Cities and OPUC agreed with TIEC that unrecovered costs are not the same thing as unrecovered revenues.[22] Cities also noted that it would be unreasonable to allow ETI to continue to incur costs for a customer the utility no longer plans to serve.[23]

In making its determination of the definition of unrecovered costs, the Commission follows the precedent set in *CenterPoint Energy Houston Electric, LLC v. Pub. Util. Comm'n*, 354 S.W.3d 899 (Tex. App—Austin, 2011 no pet.) where the Third Court of Appeals found that because the language of PURA § 39.905 did not specifically provide for recovery of "lost revenues" and that in at least two other provisions of PURA[24] the legislature expressly

---

[19] Proposal for Decision at 22 (Oct. 5, 2010).

[20] Supplemental Direct Testimony, Exhibits, and Workpapers of Phillip R. May, ETI Ex. 91 at 6.

[21] Supplemental Direct Testimony of Jeffry Pollock, TIEC Ex. 15 at 14-15.

[22] Supplemental Direct Testimony of Karl Nalepa, Cities Ex. 6C at 7 and Supplemental Cross Rebuttal Testimony of Clarence Johnson, OPUC Ex. 8 at 6.

[23] Supplemental Direct Testimony of Karl Nalepa, Cities Ex. 6C at 7-8.

[24] PURA § 55.024(b) and PURA § 56.025(e).

distinguishes "costs" from "revenues," the term "costs," as used by the legislature in PURA § 39.905, is not intended to include lost revenues.[25] Like PURA § 39.905, PURA § 39.452(b) only provides for "costs unrecovered as a result of implementation of the tariff" and does not specifically provide for the utility to recover lost revenues or any other type of costs.

Based on the evidence and testimony, the Commission finds that the proper interpretation of "costs unrecovered as a result of implementation of the CGS program tariff" is costs to implement and administer the CGS program tariff. Such unrecovered costs do not include lost revenues, embedded generation costs, or any other types of costs. The Commission reverses the proposal for decision on this issue.

### B. May 17, 2013 Stipulation and Settlement Agreement

The Commission adopts the May 17, 2013 stipulation and settlement agreement in part, and rejects the settlement in part.

Under the terms of the stipulation, the parties agreed on issues relating to a CGS credit amount, a fixed cost contribution fee, unserved energy, a termination payment, a force majeure clause, the Entergy Operating Committee, and MISO. Those issues are covered under findings of fact 53A-H. Under the stipulation, decisions regarding the CGS cost rider were to be deferred until no earlier than six months after the CGS rider became effective. The Commission adopts the stipulation except for the portion of the stipulation that would defer decisions regarding the CGS cost rider. The Commission elects to make those decisions now rather than deferring them, and no party at the open meeting objected to this proposal.

### C. CGSC rider

1. Retroactive Recovery of Historical Costs

ETI proposed to recover the costs it incurred since November 10, 2010 related to the CGS program.[26] TIEC's version of the CGSC rider would permit ETI to be able to recover the incremental, reasonable, and necessary CGS program implementation and administration costs

---

[25] *CenterPoint Energy Houston Electric, LLC v. Pub. Util. Comm'n*, 354 S.W.3d 899, 903-904 (Tex.Civ.App—Austin, 2011)

[26] ETI's redlined tariff version Exhibit DRR-SD-6 at 1, Section II Purpose.

incurred by ETI following the approval of the CGS program pursuant to PURA § 39.452(b).[27] Commission Staff did not support allowing ETI to recover costs in excess of the amounts already in base rates until the CGS program is actually implemented and the implementation costs associated with the eventual design of the CGS program are actually incurred.[28] The Commission finds that ETI should not be able to recover any costs via the CGSC rider until the CGS program is implemented.

## 2. Cost Recovery if the CGS program is unsubscribed

ETI proposed that if the CGS program is unsubscribed, the CGSC rider rate would apply to the classes that are eligible to participate in the program.[29] Commission Staff agreed with ETI and noted that even if the costs incurred to implement the program are *de minimis* because there are no subscribers, ETI would still be entitled to recover those costs under PURA § 39.452(b).[30] OPUC agreed with ETI and Commission Staff.[31] TIEC urged the Commission to defer this issue until the facts are not speculative in order to balance the twin charges of the statute of allowing ETI to recover any costs that are unrecovered as a result of the implementation of the tariff and ensuring that the tariff is not implemented in a manner that harms the sustainability or competitiveness of manufacturers that choose not to take advantage of the CGS program.[32]

The Commission finds that ETI should be allowed to recover CGSC rider costs in the event that there are no subscribers to the CGS program, because PURA § 39.452(b) entitles ETI to recover those costs. The Commission finds that those costs should be borne by the customer class that the program was designed to benefit—the LIPS and LIPS-TOD customers—the customers that are eligible to participate in the program. The Commission adopts the language proposed by ETI on this issue in Section III of the redlined tariff.

---

[27] TIEC's Initial Brief at 21-24.

[28] Commission Staff's Initial Brief at 6-7 (March 1, 2013).

[29] ETI's redlined tariff version Exhibit DRR-SD-6 at 1, Section III Rate.

[30] Commission Staff's Initial Brief at 7 (March 1, 2013).

[31] OPUC's Reply Brief at 12 (March 20, 2013).

[32] TIEC's Initial Brief at 24-25 (March 1, 2013).

3. Interest

Citing PURA § 39.452(b), that ETI should be allowed to recover any costs unrecovered as a result of implementing the tariff, ETI requested recovery of interest on the unrecovered balance of the CGSC rider charges.[33] TIEC noted that the CGSC rider would be periodically adjusted to reflect ETI's actually incurred costs, so there would be no need for ETI to accrue interest on any unrecovered balance.

The Commission finds that not allowing interest would be consistent with the treatment of rate-case expenses, which are typically amortized over a three-year period without a return on the unamortized balance.[34] ETI should not be permitted to recover interest on the unrecovered balance of the CGSC rider charges.

4. CGSC rider costs recovered in rate-base offset

OPUC argued that the interim order is clear that the costs to implement the CGS program are to be borne only by CGS customers. However, $299,372 was included in ETI's base rates for costs related to the CGS program and will be paid by all retail customer classes. OPUC recommended that the same amount that is being recovered from all retail customers in base rates for CGS costs be recovered solely through the CGSC rider. Since the LIPS class is being charged $49,192 per year in base rates, OPUC recommended that the CGS rider should be reduced by $49,192 to prevent double-recovery and that the remainder that is being recovered in retail base rates, $249,960, should be refunded directly to each class in the amount allocated in base rates.[35]

TIEC took the position that OPUC was attempting make a collateral attack on the Commission's order in ETI's rate case. Furthermore, TIEC argues that ETI should not be required to conduct OPUC's proposed "offset" for the same reason that ETI should not be permitted to include costs incurred since November 2010—the costs are not costs to implement the CGS program.[36]

---

[33] ETI's Initial Brief at 24 (March 1, 2013).

[34] TIEC's Initial Brief at 25 (March 1, 2013).

[35] OPUC's Initial Brief at 3-7 (March 1, 2013).

[36] TIEC's Reply Brief at 17-18 (March 20, 2013).

ETI proposed to credit the CGSC rider with $299,372 to recognize amounts that were used in setting ETI's current base rates. This amount represents the amount of CGS-related costs that ETI is already recovering in base rates pursuant to the Commission's order in ETI's most-recent rate case, Docket No. 39896.[37]

The Commission agrees with TIEC on this issue and goes further to state that to permit an offset to the CGSC rider for amounts already included in rates may be retroactive ratemaking.

5.        Amount to be recovered in the CGSC rider

The Commission does not reach the issue of the amount to be recovered for the implementation and administration costs at this time because the amount cannot be known until ETI actually implements the program.

## IV.     Conclusion

The Commission adopts each of the stipulation and settlement agreements except for section II.B.2 of the May 17, 2013 stipulation, and finds that unrecovered costs for the CGS program are those needed to implement and administer the CGS program and are not lost revenues, embedded generation costs, or any other types of costs. The Commission finds that ETI should not be able to recover any costs via the CGSC rider until the CGS program is implemented, that ETI should be allowed to recovery CGSC rider costs in the event that there are no subscribers to the CGS program, that ETI should not be permitted to recover interest on the unrecovered balance of the CGSC rider charges, and that ETI should not be required to conduct OPUC's proposed "offset."

---

[37] *Application of Entergy Texas, Inc. for Authority to Change Rates, Reconcile Fuel Costs, and Obtain Deferred Accounting Treatment*, Docket No. 39896, Order (Sept. 14, 2012).

## V.    Findings of Fact

### *Procedural History*

1.    As part of its application in Docket No. 37744, *Application of Entergy Texas, Inc. for Authority to Change Rates and Reconcile Fuel Costs*, ETI proposed a competitive generation service (CGS) program pursuant to Public Utility Regulatory Act. Tex. Util. Code Ann. (PURA) § 39.452(b).

2.    On July 16, 2010 and July 20, 2010, a State Office of Administrative Hearings administrative law judge held a hearing on the merits on ETI's CGS proposal.

3.    A proposal for decision was issued on November 1, 2010.   The ALJ ultimately recommended that the CGS proposal be rejected.

4.    The Commission considered the proposal for decision at the November 10 and December 1, 2010 open meetings as part of docket No. 37744.  At the December 1, 2010 open meeting, the Commission adopted the settlement for the rate case issues and severed the CGS proposal into this Docket.  The Commission requested that the parties enter into negotiations and work to come to agreement on as many of the undetermined issues as possible, and then bring the issues for which an agreement could not be reached back to the Commission for consideration.

5.    Order No. 1 was issued on December 3, 2010 severing the CGS issues into this docket, including the record in Docket No. 37744.

6.    Sabine Cogen, LP filed a motion to intervene in this docket on December 23, 2010.  ETI filed an objection to Sabine Cogen, LP's motion to intervene on December 30, 2010. Sabine Cogen, LP's motion to intervene was denied in Order No. 3 on January 12, 2011.

7.    ETI, Commission Staff, Office of Public Utility Counsel, Texas Industrial Energy Consumers, State Agencies, Kroger Co., Cities,[38] Wal-Mart Stores Texas, LLC and Sam's East, Inc., and Cottonwood Energy are parties to this proceeding.

---

[38] The cities of Anahuac, Beaumont, Bridge City, Cleveland, Conroe, Groves, Houston, Huntsville, Montgomery, Navasota, Nederland, Oak Ridge North, Orange, Pine Forest, Pinehurst, Port Arthur, Port Neches, Rose City, Shenandoah, Silsbee, Sour Lake, Splendora, Vidor, and West Orange.

8.  On January 11, 2011, the Commission ALJ issued Order No. 2 requiring ETI to either provide an update on the status of settlement discussions or to propose a schedule, agreed to by all parties, for finalizing the outstanding issues.

9.  The parties filed status reports on January 13 and 28, February 18, March 11, and April 8, 2011. These reports indicated that parties continued to negotiate and that they thought that they could narrow the issues.

10. On September 8, 2011, State Agencies, Cities, OPUC, Kroger, and Wal-Mart jointly filed a motion requesting a decision on the proposal for decision in this docket. TIEC and Commission Staff filed responses to the joint motion and generally opposed the motion. At the September 29, 2011 open meeting, the Commissioners considered the motions and issued an order requiring the parties to file pleadings identifying the CGS tariff issues that have been settled on by the parties and identifying the issues for which a settlement could not be reached. The parties were also permitted to identify issues that are contingent upon the Commission's determination of the unsettled issues.

11. On November 1, several parties filed an agreed list of settled issues. TIEC also separately filed a list of unsettled issues and request for procedural schedule. TIEC also requested that the Commission receive additional evidence in order to resolve the unrecovered costs issues because ETI's proposal in Docket No. 37744 was based on ETI's proposal for an energy-only program, not an energy and capacity-based program. The circumstances had changed primarily due to the agreement of the Entergy Operating Committee to treat CGS power from qualifying facilities in the ETI service territory as firm generation. The remainder of the parties filed a joint agreed list of unsettled issues and issues contingent on a Commission determination of unsettled issues.

12. At the December 8 and December 15, 2011 open meetings, the Commissioners decided that the parties should submit stipulated facts, the Commission would re-open the record to admit additional evidence as requested by TIEC, and then the Commission would make a decision on the three threshold unsettled issues in an interim order.

13. On December 18, 2011, Order No. 4 was issued establishing a procedural schedule.

14. On January 20, 2012, the parties submitted agreed settlement terms and stipulated facts. The parties reached agreement in principle on a number of discrete items within the overall framework of the CGS program and tariffs. Many of the items were simply elements of larger program issues that retain one or more as yet unsettled aspects essential to final resolution of that program issue. Items as to which agreement in principle existed were "subject to satisfactory resolution of unsettled issues."

15. On January 24, 2012, Order No. 5 was issued clarifying the number of copies of testimony that were to be filed by the parties.

16. On January 26, 2012, ETI submitted supplemental direct testimony. On February 10, 2012, the intervenors submitted supplemental direct testimony and on February 25, 2012, ETI and intervenors submitted rebuttal and cross rebuttal testimony. The parties submitted statements of position and pre-hearing briefs on March 26, 2012.

17. Order No. 6 was issued on February 1, 2012 setting April 19, 2012 as the date for the hearing.

18. On April 13, 2012, the parties filed an unopposed stipulation that to the extent there are costs unrecovered as a result of the implementation of a CGS tariff, those costs should be borne solely by customers taking service under the CGS tariff. ETI did not join but did not oppose the stipulation.

19. On April 18, 2012, the parties filed an unopposed stipulation regarding customer eligibility. LIPS customers will be eligible to participate in ETI's CGS program (with further limitations as set forth in the stipulation on this issue).

20. The Commission held the hearing on the merits on April 19, 2012, and issued an interim order on June 12, 2012 that adopted the unopposed issues and ruled that the types of costs that will be considered ETI's unrecovered costs for purposes of PURA § 39.452(b) are those costs necessary to implement and administer the CGS program and are not to be defined to include lost revenues, embedded generation costs, or any other types of costs.

21. Subsequent to the interim order, the parties continued discussions regarding how to develop a CGS tariff (or tariffs) that would conform to the interim order rulings and resolve other remaining contested issues.

22.     On November 27, 2012, TIEC filed a motion to adopt a competitive generation services program that included its proposed Rider Schedule CGS and Rider Schedule CGSC, the latter of which addressed ETI's recovery of its costs of implementing and administering the CGS program. TIEC's motion also addressed a number of issues that the parties had not been able to resolve, and asked that the Commission rule in TIEC's favor on those remaining contested issues.

23.     On December 4, 2012, ETI filed a response to TIEC's November 27 motion. ETI's response addressed the same contested issues raised by TIEC and asked the Commission to rule in favor of ETI's position. ETI's response also included its own versions of the CGS and CGSC riders (based on its positions on the contested issues), plus a redlined version of both riders that compared TIEC's versions to ETI's versions.

24.     On January 7, 2013, in response to a motion filed by TIEC, the Commission issued a procedural schedule that required parties to file supplemental testimony in support of their positions later in January and early February, and that parties were to indicate, on February 8, 2013, whether a hearing was necessary. Interested parties filed supplemental testimony in accordance with that schedule, and no party requested an evidentiary hearing.

25.     On February 19, 2013, the Commission issued an agreed briefing schedule which called for parties to file a joint motion to stipulate testimony and RFIs into the record on February 25, and for parties to file initial and reply briefs on March 1 and 20, respectively, which briefs were filed by ETI, TIEC, Staff, OPUC, and Cities.

26.     On May 8, 2013, TIEC filed a letter stating that TIEC and ETI had reached a preliminary agreement on the remaining disputed issues and asked that this matter be deferred to the next open meeting. All parties indicated their agreement with the deferral. The Commission deferred consideration until the May 23, 2013 open meeting.

27.     On May 17, 2013, ETI filed a stipulation and settlement agreement, which was supported by TIEC and Staff, but with Staff taking no position on Sections II.B.1 and 2 of that settlement.

28. On May 17, 2013, OPUC, Kroger, and Wal-Mart filed a Joint Statement of Opposition to the May 17 settlement. Their opposition was limited to Section II.B. of that settlement and pertained to the proposed delay in deciding certain issues before the Commission, including which customer classes should pay for costs recovered through the CGSC rider in the event there are no CGS program subscribers, and the treatment of CGS project code costs "embedded" in ETI's base rates in accordance with the Commission's order in Docket No. 39896.

29. TIEC filed a response to the Joint Statement of Opposition on May 21, 2013.

30. OPUC, Kroger and Wal-Mart filed a joint reply to TIEC's response on May 22, 2013.

31. The Commission considered this matter at its May 23, 2013 open meeting, at which it voted to accept in part and reject in part the May 17 settlement.

### *Eligible customers stipulation*

32. The parties agreed that only customers eligible to take service under ETI's Large Industrial Power Service (LIPS) are eligible customers for the CGS program.

33. The parties agreed that only LIPS firm load will be eligible to participate in the CGS program.

34. The parties agreed that LIPS customers with interruptible service (IS) or standby and maintenance service (SMS) load are not precluded from participating in the CGS program, but this participation is limited to their firm LIPS load. To the extent that customers with IS load participate in the CGS program, they must comply with the terms of the IS tariffs regarding minimum LIPS load. Only the portion of the customer's LIPS load that is in excess of the firm contract power minimum requirement under section 1 of Schedule IS is eligible for the CGS program.

35. The parties agreed that to the extent there are increased administration costs associated with billing a customer that has CGS and IS or SMS load, the CGS customer will bear the costs.

36. The parties agreed that there will be a 115 MW cap on the CGS program.

37. The parties agreed that there will be a 5 MW minimum on CGS customer load.

38.    The parties agreed that there will be no aggregation of CGS customer load to meet the 5 MW minimum on CGS customer load.

39.    The parties agreed that there will be a cap of 10 CGS purchase agreements.

**_Customers responsible for paying unrecovered costs stipulation_**

40.    The parties, except ETI, agreed that to the extent there are costs unrecovered as a result of the implementation of a CGS tariff, those costs should be borne solely by customers taking service under the CGS tariff, *i.e.,* CGS customers.    ETI did not oppose this stipulation.

**_January 20, 2012 CGS Stipulated Matters and Stipulated Facts_**

41.    In the CGS stipulated matters and stipulated facts filed on January 20, 2012, the parties stated they had reached an agreement in principle on a number of discrete items within the overall framework of the CGS program and tariffs, which were listed in Section I. A-G of the stipulation. However, many of those items were simply elements of larger program issues that retained one or more unsettled aspects essential to final resolution of that program issue.   Items as to which agreement in principle existed, subject to satisfactory resolution of unsettled issues, included the following:

A.    Eligible CGS suppliers

1.    Eligible CGS suppliers will be limited to qualifying facilities that are or will be directly connected to ETI.   Any expansion of eligible CGS suppliers would require initiation of new Commission proceedings.

B.    Amount of CGS capacity

1.    A CGS customer will specify the amount of its load to be served by a specified CGS supplier.

2.    The specified CGS supplier will enter into a contract with Entergy Services, Inc., on behalf of ETI, or directly with ETI, for the purpose of becoming an Entergy system network resource. The agreement between the CGS supplier and Entergy Services, Inc. or ETI shall include a contract for the purchase of capacity and energy (CGS purchase agreement). Per determination of the Entergy Operating Committee, the

capacity and energy contracted for under the CGS purchase agreements shall be allocated solely to ETI.

3. The level of capacity contracted for under the CGS purchase agreement (CGS contract capacity) will be the same level of capacity contracted for in a separate but related contract between the CGS supplier and the CGS customer.

4. The monthly CGS supplied capacity shall be calculated monthly based on the on-peak energy deliveries of CGS-supplied energy from the CGS supplier. The monthly CGS supplied capacity shall be the lesser of the CGS contract capacity and the result of the following calculation—on a rolling 12-month basis (using a cumulative basis during the first 11 months), the sum of the CGS-supplied energy delivered by the CGS supplier during on-peak hours, divided by the number of on-peak hours during the same time period, divided by 0.8. On-peak hours are defined as the hours ending 7:00 am through 10:00 pm Monday through Saturday, excluding North American Electric Reliability Corporation holidays.

C. CGS-customer unbundled rate

1. CGS customers are limited to, and will remain, ETI retail customers.

2. ETI will not make a capacity payment to the CGS supplier, and the CGS customer will not pay ETI the embedded production cost in the firm rate schedule under which the customer would otherwise be eligible to receive service.

3. The price for retail delivery service, including necessary ancillary services, to retail customers who choose to take advantage of the competitive generation tariff will be a rate that is unbundled from ETI's cost of service and that will be determined by a credit to the CGS customer's bill based on the unbundled production costs associated with the otherwise applicable firm rate.

4. The unbundled, embedded production cost for a LIPS customer based on current rates is $6.84 per kW per month.[39] The CGS credit is subject to review and modification in subsequent rate cases. If the clause "less any corresponding concurrent

---

[39] The parties subsequently agreed to set this amount at $6.50 per kW per month until rates are changed in ETI's next base rate case (that is, the next base rate case after May 16, 2013). Finding of Fact No. 53A.

reduction in energy purchased by the CGS customer" referenced in section F.1 below is adopted, then certain parties may recommend a further adjustment to the LIPS embedded production cost specified in this paragraph C.4.

5.      With the exception of the capacity credit and fixed fuel factor, a CGS customer will pay ETI a retail rate that includes all other charges the customer would pay as a firm customer (for example Rider TTC, HRC, SRC, SRO, and IFF charges, if applicable).

D.      CGS energy payment

1.      CGS customers will pay fuel costs based on avoided cost for CGS-supplied energy. Specifically, ETI will purchase hourly CGS energy supplied by the CGS supplier from the CGS contract capacity at the system hourly avoided-energy-cost as determined under Rate Schedule LQF. ETI will charge the CGS customer at the same rate for that hourly CGS-supplied energy not to exceed the energy requirement of the CGS customer.

E.      CGS customer fixed-cost contribution

1.      The level of compensation to ETI from CGS customers for CGS service will include a monthly fixed charge called a fixed-cost contribution.

2.      The fixed-cost contribution will be $1.10 per kW of CGS load per month.

3.      Revenues from the fixed-cost contribution will reduce any otherwise unrecovered costs associated with the program.

F.      CGS customer unserved energy rate

1.      If, in any hour in a delivery month, there is hourly CGS unserved energy, the CGS customer will take service from ETI under the CGS unserved energy rate. Hourly CGS unserved energy is the difference in any given hour between the amount of energy corresponding to the full amount of CGS contract capacity and the amount of energy actually supplied to ETI from the CGS contract capacity by the CGS supplier in such hour, not to exceed the energy requirement of the CGS customer. The parties have

not agreed whether the following clause should be added to this last sentence: "less any corresponding concurrent reduction in energy purchased by the CGS customer."[40]

2.      The structure of the CGS unserved energy tariffed rate will include an agreed energy charge and agreed O&M adder. The monthly CGS unserved energy charge will be the sum of (a) the hourly CGS unserved energy for the month times 105% of the system hourly avoided energy cost as determined under Rate Schedule LQF and (b) the hourly CGS unserved energy for the month times specified variable O&M charges specified immediately below in paragraph 3.

3.      The specified variable O&M charges for the CGS unserved energy rate are as follows:

| Delivery Voltage | On-Peak Per kWh | Off-Peak Per kWh |
|---|---|---|
| Distribution (less than 69kV) | $0.03555 | 0.00540 |
| Transmission (69kV and greater) | $0.02451 | 0.00222 |

4.      On-peak and off-peak hours for the CGS unserved energy rate are as follows:

a.      Summer: On-peak hours are 1:00 pm to 9:00 pm Monday through Friday of each week beginning on May 15 and continuing through October 15 of each year except that Memorial Day, Labor Day and Independence Day (July 4 or the nearest weekday if July 4 is on a weekend) are not on-peak.

b.      Winter: On-peak hours for each week of Monday through Friday beginning October 16 and continuing through May 14 of each year are 6:00 am to 10:00 am and 6:00 pm to 10:00 pm, except that Thanksgiving Day, Christmas Day, and New Year's Day (or the nearest weekday if the holiday should fall on a weekend) are not on-peak.

---

[40] The parties subsequently agreed that this quoted language would be added.

           c.        Off-peak hours are all hours of the year not specified as on-peak hours. With the approval of the Commission, ETI may at its sole discretion change on-peak hours and season from time to time.

           5.        Revenues from the CGS unserved energy rate derived from the variable O&M charges will go towards offsetting any unrecovered costs as a result of the implementation of the CGS tariff.

           6.        Revenues from the CGS unserved energy rate derived from 105% of the system hourly avoided energy charges will go towards offsetting ETI's eligible fuel costs.

G.      Recognition of CGS supply as firm capacity. Progress has been made on resolving issues regarding the recognition of CGS capacity as firm capacity, but final resolution of these issues, including the following, is contingent on the Entergy Operating Committee's approval as well as a final resolution of all issues.

           1.        The Entergy Operating Committee has established certain conditions that must be met before it will recognize a CGS purchase agreement as "capability" for the Entergy System, for purposes of determining reserve equalization payments or receipts. The parties are continuing to discuss the conditions established by the Operating Committee.

           2.        The capacity product from CGS purchase agreements will be a 24/7 unit-contingent product.

           3.        The delivery term of CGS purchase agreements may be from one year to five years, and must be a whole number of years.

           4.        The contract capacity will be a fixed capacity amount throughout any successive 12-month period during the contract term.

           5.        The parties have tentatively agreed to a number of concepts for firming up CGS capacity that would be reflected in a form contract for use in implementing the CGS program. The parties will continue to negotiate other concepts and terms for inclusion in a form supply contract.

42.      The parties stipulated that the Strategic Resource Plan (SRP) for the Entergy system (of which ETI is a part) projects a continuing need for additional capacity for ETI and the

Entergy system through 2017. Entergy's and ETI's resource needs are subject to change at any time based on actual experience related to operational conditions, resource offers and solicitations, and other events that affect resource needs.

43. The parties stipulated that based on an assessment of load requirements and generating capability, the SRP projects that ETI has an incremental net resource deficiency of 260 MW in 2012 and 504 MW in 2013.

44. The parties stipulated that the Entergy system-wide planning process is conducted pursuant to the requirements of the Entergy system agreement and is designed to result in a portfolio of resources that differ by term and source. The Entergy system agreement states that the objective of this process is to ensure cost-effective, reliable levels of service.

45. The parties stipulated that CGS purchase agreements are resources that will be included in the Entergy System's portfolio of supply resources, consistent with the terms and conditions related to the delivery requirements of those purchase agreements (*e.g.*, degree of dispatchability, term, degree of firmness).

46. The parties stipulated that it is reasonable at the outset of the CGS program to establish a cap on the amount of load that may subscribe to CGS service.

47. The parties stipulated that the range of the cap should be between 80 MW and 150 MW.

48. It is reasonable to adopt the three unopposed 2012 stipulation and settlement agreements regarding customer eligibility for the CGS program; the customers responsible for paying for unrecovered costs; the capacity deficit; and the program cap.

### *Unrecovered costs*

49. PURA § 39.452(b) provides for the utility to be able to recover any costs unrecovered as a result of the implementation of the tariff.

50. In *CenterPoint*, the Third Court of Appeals found that because the language of PURA § 39.905 did not specifically provide for recovery of "lost revenues" and that in at least two other provisions of PURA the legislature expressly distinguishes "costs" from "revenues," the term "costs," as used by the legislature in PURA § 39.905, is not intended to include lost revenues. Like PURA § 39.905, PURA § 39.452(b) only

provides for "costs unrecovered as a result of implementation of the tariff" and does not specifically provide for the utility to recover lost revenues or any other type of costs.

51.      The Commission finds that the costs that will be unrecovered as a result of the implementation of the CGS program tariff are the costs to implement and administer the CGS program tariff.

### *The May 17, 2013 Stipulation and Settlement Agreement*

52.      The May 17 settlement addresses the remaining contested issues that were not resolved through the 2012 stipulation and settlement agreements and the interim order. The substantive provisions of the May 17 settlement address the CGS rider, the CGSC rider, and appeal rights.

53.      Agreements as to CGS Rider:

A.      CGS Credit: The parties agree to a CGS credit set at $6.50 per kW/month until rates are changed in ETI's next base rate case.

B.      Unserved Energy: The parties agree to accept TIEC's proposed CGS rider tariff language in the Second Supplemental Direct Testimony of Jeffry Pollock, which will allow a CGS customer to attempt to decrease its load to match a decrease in deliveries by the CGS supplier and thereby avoid unserved energy charges to the extent the CGS customer's CGS load is reduced.

C.      Termination Payment: The parties agree to remove ETI's proposed liquidated damages provisions from the CGS rider and deal with liquidated damages provisions in the supplier contract negotiations. The amount of liquidated damages, if any, received by ETI shall be used to offset any capacity costs incurred by ETI to replace the lost CGS supply.

D.      The Tracking Certificate: The parties agree to remove ETI's proposed prioritization provisions in Section G(5) and H from the tracking certificate (leaving them to contract negotiations) and delete the provisions that would require the CGS customer to provide what TIEC deemed "competitively sensitive" information.

E.      Force Majeure: The parties agree to remove TIEC's proposed force majeure provision.

F.     The Entergy Operating Committee: The parties agree to remove the following ETI-proposed "reservation" provision from the CGS rider:

> In addition, entering into new ETI-Supplier Contracts under the CGS Program (*i.e.,* ETI-Supplier Contracts that have not already been entered into by ETI in response to CGS Service requests) at any given time must be consistent with the Entergy System's need for capacity. Capacity resources associated with the CGS Program will receive no preferential treatment, but will be considered as part of the Entergy System's planning process on the same basis as other potential capacity resources. Recognition of the capacity component of the CGS Program on an ongoing basis is contingent on periodic Entergy Operating Committee conclusion that ETI requires the capability that would be obtained through this program component.
>
> ...
>
> ETI shall have the right by notice to the applicable customer, to deny or terminate a request for CGS Service at any time prior to entering into the ETI-Supplier Contract corresponding to such request if the limitations in the penultimate paragraph of § I above apply . . .
>
> ...
>
> The following clause in Rider CGS Section III.B.3 of ETI's proposed Rider CGS is modified as follows: Unless a CGS Service request is earlier denied or terminated according to tariff provisions (or provisions of law) applicable to the CGS Service . . .

G.     MISO: The parties agree that ETI's proposed RTO/MISO provision will stay in the CGS rider, but the phrase "it will be necessary or appropriate to include [MISO terms and conditions]" is changed to "it may be appropriate to include [MISO terms and conditions)."

H.     $1.10 Fixed Cost Contribution Fee: The parties agree that this fee will not be applied as an offset to CGS administration and implementation costs.

54.     Agreement as to CGSC Rider:

A.     ETI has agreed that an application for the CGSC rider will be filed with the Commission no earlier than six months after the CGS rider becomes effective.

B.     Section II.B.2. in the May 17, 2013 settlement was challenged by OPUC, Kroger, and Wal-Mart, with Cities also supporting resolution of the issues in Section II.B.2. now, rather than deferring them as proposed in the May 17, 2013 settlement.

C.      Other than Section II.B.2, no other sections of the May 17 settlement were opposed by OPUC, Kroger, Wal-Mart, or Cities, and were supported by ETI, TIEC, and Commission Staff. The Commission finds that those unopposed provisions in the May 17 settlement are reasonable and in the public interest.

D.      The record from the current CGS docket (Docket No. 38951) and from Docket No. 37744 shall be incorporated into the record in the CGSC rider application docket.

E.      All parties agree that only the variable O&M portion of the unserved energy rate should be used to offset the unrecovered implementation and administrative costs. Fuel-related revenues from the unserved energy rate will offset ETI's fuel balance, and not be used to offset unrecovered costs.

F.      There will be no changes to ETI's current base rates as a result of this proceeding.

55.     Agreement as to Appeal Rights: The parties agree that ETI is not waiving its right to appeal the Commission's final order to the courts on any issues that are not resolved by settlement in this docket. All parties reserve their rights under applicable state and federal law.

56.     Proposed CGS Program Tariff: The proposed CGS program tariff (the CGS rider), which is attached to the May 17 settlement as Attachment 1, is agreed to by the parties and represents the CGS program as set out in the preceding Findings of Fact.

57.     The Commission makes the following findings regarding the five issues within Section II.B.2. of the May 17 settlement:

A.      The appropriate date upon which ETI is authorized to begin accruing CGS program implementation and administration costs is the date that the CGS Rider implemented.

B.      In the event there are no subscribers to the CGS program, it is reasonable and appropriate for unrecovered implementation and administration costs accrued to the CGSC rider will be charged to the LIPS and LIPS-TOD customers, the customer class that the program was designed to benefit.

C.      It is not appropriate for ETI to recover interest on the unrecovered balance of the CGSC rider charges.

D.     It is not appropriate for there to be an offset to the CGSC rider for amounts included in rates in Docket No. 39896.

E.     The Commission declines to address at this time the amount to be recovered as implementation and administration costs because such amount is not known at this time.

## VI.    Conclusions of Law

1.    The Commission has jurisdiction and authority over this proceeding pursuant to PURA §§ 14.001 and 39.452(b).

2.    PURA § 39.452(b) does not allow for the recovery of lost revenue or embedded generation costs.

## VII.    Ordering Paragraphs

1.    The Commission adopts each of the three stipulation and settlement agreements filed on January 20, 2012, April 30, 2012, and April 18, 2012.

2.    The Commission adopts each of the provisions of the stipulation and settlement agreement filed on May 17, 2013, except for section II.B.2, pertaining to deferring decisions on issues related to (a) the date ETI uses to start accruing implementation costs, (b) whether rider CGSC will also recover interest on unrecovered costs, (c) whether any historical costs billed to the CGS project code that are currently in base rates should be removed from base rates, credited, and recovered through rider CGSC, and (d) who pays if there are no subscribers. Those issues are resolved as set forth in this order. Accordingly, the Commission adopts in part and rejects in part the May 17 settlement as set forth in this order.

3.    The CGS rider, attached to the May 17 stipulation and settlement agreement, is approved as of the date of this order. ETI shall file a clean CGS rider tariff in this docket within 10 days of the date of this order.

4.    In the event there are no subscribers to the CGS program, unrecovered implementation and administration costs accrued to the CGSC rider will be charged to the LIPS and LIPS-TOD customers, the customer class that the program was designed to benefit.

5.      ETI is not authorized to recover interest on the unrecovered balance of the CGSC rider charges.

6.      There shall be no offset to the CGSC rider for amounts included in rates in Docket No. 39896.

7.      The Commission declines to address at this time the amount to be recovered as implementation and administration costs because such amount is not known at this time.

8.      The date upon which ETI is authorized to begin accruing CGS program implementation and administration costs is the date that the CGS Rider is implemented.

9.      ETI shall not file an application for the CGSC rider earlier than six months after the CGS rider becomes effective. ETI shall file an application for the CGSC rider in accordance with the agreement approved by this order.

10.     All other motions, requests for entry of specific findings of fact and conclusions of law, and any other requests for general or specific relief, if not expressly granted, are denied.

**SIGNED AT AUSTIN, TEXAS the** _19th_ **day of July 2013**

**PUBLIC UTILITY COMMISSION OF TEXAS**

**DONNA L. NELSON, CHAIRMAN**

**KENNETH W. ANDERSON, JR., COMMISSIONER**

# APPENDIX C

Vernon's Texas Statutes and Codes Annotated
    Utilities Code (Refs & Annos)
        Title 2. Public Utility Regulatory Act
            Subtitle B. Electric Utilities (Refs & Annos)
                Chapter 39. Restructuring of Electric Utility Industry
                    Subchapter J. Transition to Competition in Certain Non-Ercot Areas

V.T.C.A., Utilities Code § 39.452

§ 39.452. Regulation of Utility and Transition to Competition
Effective: June 19, 2009
Currentness

(a) Until the date on which an electric utility subject to this subchapter is authorized by the commission to implement customer choice under Section 39.453, the rates of the electric utility shall be regulated under traditional cost-of-service regulation and the electric utility is subject to all applicable regulatory authority prescribed by this subtitle and Subtitle A, including Chapters 14, 32, 33, 36, and 37.

(b) An electric utility subject to this subchapter shall propose a competitive generation tariff to allow eligible customers the ability to contract for competitive generation. The commission shall approve, reject, or modify the proposed tariff not later than September 1, 2010. The tariffs subject to this subsection may not be considered to offer a discounted rate or rates under Section 36.007, and the utility's rates shall be set, in the proceeding in which the tariff is adopted, to recover any costs unrecovered as a result of the implementation of the tariff. The commission shall ensure that a competitive generation tariff shall not be implemented in a manner that harms the sustainability or competitiveness of manufacturers that choose not to take advantage of competitive generation. Pursuant to the competitive generation tariff, an electric utility subject to this subsection shall purchase competitive generation service, selected by the customer, and provide the generation at retail to the customer. An electric utility subject to this subsection shall provide and price retail transmission service, including necessary ancillary services, to retail customers who choose to take advantage of the competitive generation tariff at a rate that is unbundled from the utility's cost of service. Such customers shall not be considered wholesale transmission customers. Notwithstanding any other provision of this chapter, the commission may not issue a decision relating to a competitive generation tariff that is contrary to an applicable decision, rule, or policy statement of a federal regulatory agency having jurisdiction.

(c) That portion of any commission order issued before the effective date of this section requiring the electric utility to comply with a provision of this chapter is void.

(d) Until the date on which an electric utility subject to this subchapter implements customer choice:

(1) the provisions of this chapter do not apply to that electric utility, other than this subchapter, Sections 39.904 and 39.905, the provisions relating to the duty to obtain a permit from the Texas Commission on Environmental Quality for an electric generating facility and to reduce emissions from an electric generating facility, and the provisions of Subchapter G that pertain to the recovery and securitization of hurricane reconstruction costs authorized by Sections 39.458-39.463; and

(2) the electric utility is not subject to a rate freeze and, subject to the limitation provided by Subsection (b), may file for rate changes under Chapter 36 and for approval of one or more of the rate rider mechanisms authorized by Sections 39.454 and 39.455.

(e) An electric utility subject to this subchapter may proceed with and complete jurisdictional separation to establish two vertically integrated utilities, one of which is solely subject to the retail jurisdiction of the commission and one of which is solely subject to the retail jurisdiction of the Louisiana Public Service Commission.

(f) Not later than January 1, 2006, an electric utility subject to this subchapter shall file a plan with the commission for identifying the applicable power region or power regions, enumerating the steps to achieve the certification of a power region in accordance with Section 39.453, and specifying the schedule for achieving the certification of a power region. The utility may amend the plan as appropriate. The commission may, on its own motion or the motion of any affected person, initiate a proceeding to certify a qualified power region under Section 39.152 when the conditions supporting such a proceeding exist.

(g) Not later than the earlier of January 1, 2007, or the 90th day after the date the applicable power region is certified in accordance with Section 39.453, the electric utility shall file a transition to competition plan. The transition to competition plan must:

(1) identify how the electric utility intends to mitigate market power and to achieve full customer choice, including specific alternatives for constructing additional transmission facilities, auctioning rights to generation capacity, divesting generation capacity, or any other measure that is consistent with the public interest;

(2) include a provision to reinstate a customer choice pilot project and to establish a price to beat for residential customers and commercial customers having a peak load of 1,000 kilowatts or less; and

(3) include any other additional information or provisions that the commission may require.

(h) The commission shall approve, modify, or reject a plan filed under Subsection (g) not later than the 180th day after the date the plan is filed unless a hearing is requested by any party to the proceeding. A modification to the plan by the commission may not be in conflict with the jurisdiction or orders of the Federal Energy Regulatory Commission or result in significant additional cost without allowing for timely recovery for that cost. If a hearing is requested, the 180-day deadline is extended one day for each day of the hearing. The transition to competition plan shall be updated or amended annually, subject to commission approval, until the initiation of customer choice by an electric utility subject to this subchapter. Consistent with its jurisdiction, the commission shall have the authority in approving or modifying the transition to competition plan to require the electric utility to take reasonable steps to facilitate the development of a wholesale generation market within the boundaries of the electric utility's service territory.

(i) Notwithstanding any other provision of this chapter, if the commission has not approved the transition to competition plan under this section before January 1, 2009, an electric utility subject to this subchapter shall cease all activities relating to the transition to competition under this section. The commission may, on its own motion or the motion of any affected person, initiate

a proceeding under Section 39.152 to certify a power region to which the utility belongs as a qualified power region when the conditions supporting such a proceeding exist. The commission may not approve a plan under Subsection (g) until the expiration of four years from the time that the commission certifies a power region under Subsection (f). If after the expiration of four years from the time the commission certifies a power region under Subsection (f), and after notice and a hearing, the commission determines consistent with the study required by Section 5, S.B. No. 1492, Acts of the 81st Legislature, Regular Session, 2009, that the electric utility cannot comply with Section 38.073, it shall consider approving a plan under Subsection (g).

(j) Notwithstanding any other provision of this subtitle, in awarding a certificate of convenience and necessity or allowing cost recovery for purchased power by an electric utility subject to this section, the commission shall ensure in its determination that the provisions of Sections 37.056(c)(4)(D) and (E) are met and that the generating facility or the purchased power agreement satisfies the identified reliability needs of the utility.

**Credits**

Added by Acts 2005, 79th Leg., ch. 1072, § 1, eff. June 18, 2005. Amended by Acts 2006, 79th Leg., 3rd C.S., ch. 11, § 1, eff. May 31, 2006; Acts 2009, 81st Leg., ch. 1226, § 3, eff. June 19, 2009.

V. T. C. A., Utilities Code § 39.452, TX UTIL § 39.452
Current through the end of the 2013 Third Called Session of the 83rd Legislature

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.